**HEALTH CARE REVIEW INC.**

v.

**Donna E. SHALALA, Secretary of Health and Human Services,**

and

**Bruce C. Vladeck, Administrator of Health Care Financing Administration,**

and

**Barbara J. Gagel, Director of Health Standards and Quality Bureau, Health Care Financing Administration,**

and

**Brian Hebbel, Contracting Officer, Health Standards and Quality Bureau, Health Care Financing Administration.**

C.A. 95–529ML.

United States District Court,
D. Rhode Island.

May 17, 1996.

Stephen D. Zubiago, Marc A. Crisafulli, Edwards & Angell, Providence, RI, Jerrol A. Crouter, Deirdre Smith, Drummond Woodsum & MacMahon, Portland, ME, for Plaintiff.

Robin Feder, United States Attorney's Office, Providence, RI, for Defendant.

## MEMORANDUM AND ORDER

LISI, District Judge.

This matter is before the court on defendants' motion to dismiss for lack of subject matter jurisdiction or, alternatively, for summary judgment. For the reasons stated, the motion to dismiss for lack of subject matter jurisdiction is granted.

### Background

The Medicare program, as established by 42 U.S.C. § 1395 et seq., compensates health care professionals and organizations for certain medical care provided to eligible aged and disabled persons. In 1982 Congress amended the Medicare statute by enacting the Peer Review Improvement Act (the Act). Pub.L. No. 97–248, § 143, 96 Stat. 382 (1982). The Act established a new regimen for reviewing the quality and medical necessity of health care provided to Medicare beneficiaries. *American Hospital Association v. Bowen*, 834 F.2d 1037, 1041 (D.C.Cir.1987). The peer review program, as defined in 42 U.S.C. § 1320c et seq., requires that the Department of Health and Human Services (HHS) enter into contracts with utilization and quality control peer review organizations to provide peer review services within certain geographic regions. 42 U.S.C. § 1320c–2(a)(2)(A). The functions of a peer review organization (PRO) include, *inter alia*, the review of services that physicians and other health care professionals have provided in order to determine whether those services were medically necessary and consistent with professionally recognized standards of care. 42 U.S.C. § 1320c–3(a)(1). Based upon its determination, the PRO may conclude that the Medicare program should not pay for services rendered. 42 U.S.C. § 1320c–3(a)(2). "In passing [the Act], Congress painted with a broad brush, leaving HHS to fill in many important details of the workings of peer review." *American Hospital*, 834 F.2d at 1042. Beyond the "relatively skeletal requirements of [§ 1320c et seq.] Congress left much of the specifics of the hospital-PRO relationship to the inventiveness of HHS empowering it to promulgate regulations governing PROs in order to implement the peer review program." *Id.* at 1043.

Health Care Review Incorporated (HCRI), is a PRO incorporated in the state of Rhode Island. HCRI currently has contracts with the Secretary of HHS (Secretary), to serve as the PRO for the states of Rhode Island and Maine. HCRI has held the Maine PRO contract since 1984. The terms of the current Maine contract began in January 1992. By agreement of the parties the term of the contract was extended in 1995. It is scheduled to expire on June 30, 1996.

On March 31, 1995, Edward Lynch (Lynch), the president of HCRI, received a letter from Robert Keller (Keller), the Executive Director of Maine Medical Assessment Foundation (MMAF), informing him that MMAF had been "encouraged to consider applying for the PRO contract for [the state of] Maine" as a result of the Secretary's initiative to promote competition in states in which out-of-state contractors currently held PRO contracts. December 1995 Lynch Affidavit at Exhibit B. On May 3, 1995, pursuant to 42 U.S.C. § 1320c–2(i), the Secretary published an announcement in the Federal Register. *Id.* at Exhibit C. The notice identified the states in which an out-of-state organization was the current PRO and invited "interested in-[s]tate organizations [to] submit statements of interest to be the PRO" for the applicable states. *Id.* The notice provided that

"[i]n its statement of interest, the organization must furnish materials that demonstrate that it meets the definition of an in-[s]tate organization. Specifically, the organization must have its primary place of business in the State in which review will be conducted or be owned by a parent corporation, the headquarters of which is located in that State. In its statement, each interested organization must further

demonstrate that it meets the following requirements:

A. Be Either a Physician–Sponsored or a Physician–Access Organization

. . . . .

B. Have at Least One Individual Who Is a Representative of Consumers on Its Governing Board[.]" *Id.; see also* 60 Fed.Reg. 21824, 21825 (1995); 42 U.S.C. §§ 1320c–1(1)(A) and 1320c–2(i)(3).

The notice further delineated the specific eligibility requirements for a physician-sponsored or a physician-access organization.[1] If an organization met the eligibility requirements and submitted a statement of interest it would be entitled to participate in the competitive bidding for the PRO contract. *Id.* The notice set June 2, 1995, as the deadline for receipt of statements of interest. *Id.*

By letter dated May 26, 1995, Keller asked Brian Hebbel (Hebbel), the contracting officer for the Health Care Financing Administration (HCFA) of HHS, to review MMAF's formal letter of interest to be the Maine PRO. December 1995 Deidre M. Smith Affidavit at Exhibit B. The letter informed Hebbel that MMAF wished to "file a Statement of Interest to be considered for participation in a competitive renewal for the PRO contract for the State of Maine." *Id.* at Exhibit D. The letter was received by Hebbel on June 1. *Id.* On June 12, Hebbel wrote a letter to Keller informing him that HCFA had received MMAF's statement of interest but HCFA needed additional information to ensure that MMAF met the requirements of a physician-sponsored or physician-access organization. *Id.* at Exhibit E. The letter provided that

> "[i]n your submission, you list various study groups. However, to insure that your organization meets the Federal Register Notice definitions of a Physician Sponsored or Physician Access Organization, you must submit additional information to [HCFA] showing the various specialty groups that are comprised in the study groups. This information will be required before a final decision can be made.
>
> Please submit this information to us not ... later ... than June 16, 1995." *Id.*

On June 13, Keller provided Hebbel with a "complete listing of the physicians who are members of each of [MMAF's] study groups." *Id.* at Exhibit F. On June 23, Keller wrote a letter to Hebbel clarifying MMAF's present status with regard to its access to physicians in three areas: neurology, nephrology, and gerontology. *Id.* at Exhibit G.

---

1. "1. Physician–Sponsored Organization

i. The organization must be composed of a substantial number of the licensed doctors of medicine and osteopathy practicing medicine or surgery in the review area, and be representative of the physicians practicing in the review area.

ii. The organization must not be a health care facility, health care facility association, or health care facility affiliate.

iii. In order to meet the substantial number requirement of A.1.i., an organization must be composed of at least 10 percent of the licensed doctors of medicine and osteopathy practicing medicine or surgery in the review area. In order to meet the representation requirement of A.1.i., an organization must state and have documentation in its files demonstrating that it is composed of at least 20 percent of the licensed doctors of medicine and osteopathy practicing medicine or surgery in the review area; or, if the organization does not demonstrate that it is composed of at least 20 percent of the licensed doctors of medicine and osteopathy practicing medicine or surgery in the review area, then the organization must demonstrate in its statement of interest, through letters of support from physicians or physician organizations, or through other means, that it is representative of the area physicians.

2. Physician–Access Organization

i. The organization must have available to it, by arrangement or otherwise, the services of a sufficient number of licensed doctors of medicine or osteopathy practicing medicine or surgery in the review area to assure adequate peer review of the services provided by the various medical specialities and subspecialties.

ii. The organization must not be a health care facility, health care facility association, or health care facility affiliate.

iii. An organization meets the requirements of A.2.i., if it demonstrates that it has available to it at least one physician in every generally recognized specialty; and has an arrangement or arrangements with physicians under which the physicians would conduct review for the organization." 60 Fed.Reg. 21824, 21825 (1995); *see also* 42 U.S.C. § 1320c–1(1)(A); 42 C.F.R. §§ 462.101–462.106.

On June 28, Lynch requested from Hebbel a copy of any statement of interest submitted by any interested in-state organization in response to the May 3 notice. December 1995 Lynch Affidavit at Exhibit D. On July 13, HCRI received notice of the Secretary's intent not to renew its Maine PRO contract. *Id.* at Exhibit E; *see also* 42 U.S.C. § 1320c–2(c)(4). The notice from the Secretary stated that the reason why the contract would not be noncompetitively renewed was that "at least one eligible in-[s]tate organization has proposed to serve as the PRO for the State of Maine...." *Id.; see also* 42 U.S.C. § 1320c–2(i). The July 13 correspondence also notified HCRI that it had the opportunity to "respond to this notice by submitting data, interpretations of data, and other information pertinent to [the Secretary's] rational [sic] for the proposed nonrenewal." *Id.* at Exhibit E. On July 18, HCRI again requested information regarding the names and the qualifications of all the interested in-state organizations that had submitted statements in response to the notice published in the Federal Register. December 1995 Lynch Affidavit at Exhibit F. HCRI "stressed that the only way [it] could have a meaningful opportunity to respond to the" notice of intent not to renew "was to receive this information." December 1995 Lynch Affidavit at Paragraph 13.

On July 18, Hebbel denied HCRI's request for the names and qualifications of the organizations that had filed a statement of interest, advising Lynch that HCFA could not

> "provide you a copy of the information submitted by the in-state organization. In the event that the 5th round Maine contract is competed, the information contained in their letter is information that could be used to prepare their proposal. Your receipt of this information could damage the integrity of the competitive procurement process." *Id.* at Exhibit G.

On August 4, Hebbel advised Lynch that HCRI had not provided any information

> "pertinent to our rationale for nonrenewal of your Maine contract. As a result, you are hereby advised that, because at least one eligible in-[s]tate organization has proposed to serve as the PRO for the State of

Maine, the contract with HCR[I] will not be renewed.

> Receipt of this notice does not preclude your organization from submitting a proposal in response to the upcoming competitive request for proposals for PRO review for the State of Maine." *Id.* at Exhibit H.

In response, Lynch asserted that

> "the sole basis on which HCFA determined that the contract should not be renewed is its belief that 'at least one eligible in-state organization has proposed to serve as the PRO for the State of Maine.['] If those so-called interested organizations are not in fact qualified to serve as the PRO for the State of Maine, then HCFA's decision not to renew the contract was incorrect.
>
> In the July 18 letter ... I requested that HCFA provide Health Care Review Inc. the names and qualifications of all in-state organizations that have expressed an interest in becoming Maine's PRO. HCFA has refused to provide that information. Because HCFA has refused to identify the qualifications of interested in-state organizations, Health Care Review Inc. has had no opportunity to respond to HCFA's sole basis for nonrenewal." *Id.* at Exhibit I.

On October 3, 1995, HCRI instituted this suit by filing a complaint for declaratory and injunctive relief.

### *Procedure Posture*

In its complaint, HCRI alleged that its cause of action arose out of a "wrongful and unconstitutional nonrenewal" of its contract with HHS. Plaintiff's Complaint for Declaratory and Injunctive Relief at Paragraph 1. HCRI alleged that the Secretary issued her final notice of nonrenewal without providing HCRI a meaningful opportunity to respond to her decision. *Id.* HCRI contended that by *not providing it with a meaningful opportunity* to respond, the Secretary ignored its procedural due process rights and overlooked the express terms of the contract. *Id.* at Paragraphs 43, 44, 45–48. In its prayer for relief HCRI petitioned this court to (1) declare that the Secretary's failure to provide it with a meaningful opportunity to respond to her decision deprived HCRI of its constitu-

tionally protected property interest without the due process of law and constituted a breach of contract; (2) declare the Secretary's notice of nonrenewal of the contract void; (3) issue a permanent injunction requiring the Secretary to renew HCRI's contract automatically; and, (4) award HCRI its costs and counsel fees and any other further relief that "may be just and equitable." *Id.* at pp. 9–10.

On November 17, 1995, HCRI filed a motion for a preliminary injunction. In addition to its memorandum, HCRI included affidavits from Lynch and from its counsel, Deirdre M. Smith (Smith). Attached to both affidavits were exhibits that HCRI alleged were pertinent to its argument. Several of the attached exhibits were received by HCRI in response to its discovery requests. On December 6, 1995, the Secretary filed her motion to dismiss for lack of jurisdiction or, alternatively, for summary judgment. In addition to her memorandum of law filed in support of her motion, the Secretary included an affidavit from Hebbel.

On December 13, 1995, this court heard arguments on HCRI's motion for a preliminary injunction. After hearing the arguments of counsel, this court denied HCRI's motion. On December 21, 1995, HCRI filed an objection and accompanying memorandum of law in opposition to the Secretary's motion to dismiss or in the alternative for summary judgment. HCRI's memorandum incorporated by reference the materials that had been submitted in support of its motion for a preliminary injunction and included a statement of material facts in dispute and additional affidavits from Lynch and Smith. HCRI alleged that there were material facts in dispute regarding (1) whether the Secretary, as a result of statutory law, the contract and her conduct, custom and practice, had created a constitutionally protected property interest in the automatic renewal of HCRI's contract; (2) whether the Secretary, as a matter of conduct, custom and practice, automatically renews PRO contracts barring performance deficiencies or the submission of a statement of interest by a "qualified" in-state organization; and, (3) whether MMAF was a "qualified" in-state organization.

## Contentions

HCRI alleges that federal law, the terms of its current contract, and the Secretary's past conduct, custom and practice confer upon it a constitutionally protected property right to the "noncompetitive renewal" of its current Maine PRO contract. HCRI alleges that by declining to disclose the basis of the Secretary's decision not to automatically renew HCRI's contract, *i.e.*, the "qualifications" of the in-state organization, the Secretary denied HCRI the due process attendant upon its right to the automatic renewal of the contract.

The Secretary contends that the plain and unambiguous language of the controlling statute precludes this court's adjudication of HCRI's claim. In the event that this court determines that it has the jurisdiction to adjudicate HCRI's claim, the Secretary argues that HCRI's due process claim is without merit because HCRI does not have an actionable property interest in the automatic renewal of its contract.

## Standard of Review

Before addressing the legal grounds upon which the Secretary claims she is entitled to judgment, it is incumbent upon this court to outline the standards under which the motion will be reviewed. As noted above, the Secretary has filed a motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R.Civ.P. 12(b)(1), or, in the alternative, a motion for summary judgment pursuant to Fed.R.Civ.P. 56.

A motion to dismiss attacking the subject matter jurisdiction of a court must be considered before other challenges since the court must find jurisdiction before determining the validity of a claim. *See Bell v. Hood,* 327 U.S. 678, 682–83, 66 S.Ct. 773, 776–77, 90 L.Ed. 939 (1946); *Gould, Inc. v. Pechiney Ugine Kuhlmann,* 853 F.2d 445, 450 (6th Cir.1988); *see generally Northeast Erectors Association of the BTEA v. Secretary of Labor,* 62 F.3d 37, 39 (1st Cir.1995) (noting that when a court is faced with both a 12(b)(1) and 12(b)(6) motion it "should ordinarily decide the 12(b)(1) motion first"). Al-

though Fed.R.Civ.P. 12(b)(6) contains a provision allowing a court to convert the motion to one for summary judgment if matters outside the pleadings are considered, Fed. R.Civ.P. 12(b)(1) does not contain any similar provision. *American Express International, Inc. v. Mendez–Capellan*, 889 F.2d 1175, 1178 (1st Cir.1989). " 'It is not important whether the objection is called a motion to dismiss or one for summary judgment. Since the same relief is sought, the difference in name is unimportant. In any event, the affidavits presented are available on either motion.' " *Id.* (quoting *Central Mexico Light & Power Co. v. Munch*, 116 F.2d 85, 87 (2d Cir.1940)); *see also Berrios v. Department of the Army*, 884 F.2d 28, 33 (1st Cir.1989) (noting that where federal jurisdiction is attacked pursuant to Rule 12(b)(1) courts should give plaintiffs an opportunity to present facts by affidavit, deposition or through an evidentiary hearing supporting the claim of jurisdiction); *Gould*, 853 F.2d at 451 (noting that a district court may "consider affidavits, allow discovery, hear oral testimony, order an evidentiary hearing, or even postpone its determination if the question of jurisdiction is intertwined with the merits"); *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir.), *cert. denied*, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981). The plaintiff must carry the burden of " 'proving the facts necessary to sustain jurisdiction....' " *American Express*, 889 F.2d at 1178 (quoting *Escude Cruz v. Ortho Pharmaceutical Corp.*, 619 F.2d 902, 904 (1st Cir.1980)); *see also Lundquist v. Precision Valley Aviation, Inc.*, 946 F.2d 8 (1st Cir.1991). A district court has "very broad discretion in determining the manner in which it will consider the issue of jurisdiction." *Valedon Martinez v. Hospital Presbiteriano de la Comunidad, Inc.*, 806 F.2d 1128, 1132 (1st Cir.1986); *see also Rivera–Flores v. Puerto Rico Telephone Co.*, 64 F.3d 742, 748 (1st Cir.1995) (noting that the district court has "great latitude to direct limited discovery and to make such factual findings as are necessary to determine its subject matter jurisdiction").

"When subject-matter jurisdiction is questioned, the court must, of course, satisfy itself of its authority to hear the case, and in so doing, it may resolve factual disputes. The court has considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction, and normally it may rely upon either written or oral evidence. The court must, however, afford the non-moving party an ample opportunity to secure and present evidence relevant to the existence of jurisdiction." *Prakash v. American University*, 727 F.2d 1174, 1179–81 (D.C.Cir.1984) (citations, footnotes and internal quotation marks omitted).

HCRI has responded to the Secretary's motion by way of a memorandum of law which incorporates by reference the affidavits from Lynch and Smith, and other pertinent documents.[2]

### *Subject Matter Jurisdiction*

The Secretary argues that judicial review of her decision not to automatically renew HCRI's contract is barred by 42 U.S.C. § 1320c–2(f). Section 1320c–2(f) provides that "[a]ny determination by the Secretary to terminate or not to renew a contract under this section shall not be subject to judicial review." 42 U.S.C. § 1320c–2(f).

"[J]udicial review of a final agency action by an aggrieved person will not be cut off unless there is a persuasive reason to believe that such was the purpose of Congress. A clear command of the statute will preclude review; and such a command of the statute may be inferred from its purpose. It is, however, only upon a showing of clear and convincing evidence of a contrary legislative intent, that the courts should restrict access to judicial review." *Barlow v. Collins*, 397 U.S. 159, 166–67 [90 S.Ct. 832, 837–38, 25 L.Ed.2d 192] (1970) (citations and internal quotations omitted).

---

**2.** The court notes that the Secretary filed a motion for leave to file a reply to HCRI's memorandum of law in support of its objection to the Secretary's motion. HCRI responded by filing an objection to the Secretary's motion for leave

to file a reply based on its contention that the local rules do not provide for the filing of a reply. The court concludes that neither filing presents any additional information that is pertinent to, or necessary for, this court's analysis.

■ The question of whether a statute precludes judicial review "is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Lindahl v. Office of Personnel Management,* 470 U.S. 768, 779, 105 S.Ct. 1620, 1627, 84 L.Ed.2d 674 (1985) (quoting *Block v. Community Nutrition Institute,* 467 U.S. 340, 345–46, 104 S.Ct. 2450, 2453–54, 81 L.Ed.2d 270 (1984)). In analyzing the question of judicial preclusion, the First Circuit has recognized

> " 'a strong presumption in favor of review, which is overcome only by 'clear and convincing evidence' that Congress intended to cut off review.... Such evidence may, however, be drawn not only from explicit language but also from a statute's purpose and design.... In the absence of a clear declaration of Congressional intent, three factors seem to us determinative: first, the appropriateness of the issues raised for review by the courts; second, the need for judicial supervision to safeguard the interests of the plaintiffs; and third, the impact of review on the effectiveness of the agency in carrying out its assigned role.' " *Colon v. Carter,* 633 F.2d 964, 966–67 (1st Cir.1980) (quoting *Hahn v. Gottlieb,* 430 F.2d 1243, 1249 (1st Cir.1970)).

The Supreme Court, however, has noted that a statute which precludes constitutional challenges to statutory limitations would not only be "extraordinary, such that 'clear and convincing' evidence would be required before we would ascribe such intent to Congress ... *but it would ... raise[ ] ... serious constitutional question[s] of the validity of the statute so construed." Weinberger v. Salfi,* 422 U.S. 749, 762, 95 S.Ct. 2457, 2465, 45 L.Ed.2d 522 (1975) (emphasis added) (citing *Johnson v. Robison,* 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974)).

HCRI contends that, even if this court determines that § 1320c–2(f) precludes judicial review of the Secretary's decision not to automatically renew the contract, the statute cannot preclude judicial review of its constitutional challenges to that decision. The Secretary counters that HCRI has attempted to recast its grievance in constitutional terms as a subterfuge to avoid dismissal for lack of jurisdiction. Before this court may consider HCRI's constitutional challenges it must first decide whether it was Congress' intent to preclude judicial review of the decision of the Secretary not to automatically renew a PRO contract.

### *The Question of Judicial Preclusion and § 1320c–2(f)*

■ A court interpreting statutory language must follow certain methods of construction and must afford the statute a practical common sense reading. *O'Connell v. Shalala,* 79 F.3d 170, 176 (1st Cir.1996). The plain meaning of the statutory language controls the statute's construction. *Summit Investment and Development Corp. v. Leroux,* 69 F.3d 608 (1st Cir.1995). This meaning is to be "gleaned from the statute as a whole including its overall policy and purpose...." *Id.* at 610 (citations omitted). Courts should not place undue force upon selected words read in a vacuum but must examine the statute as a whole "giving due weight to design, structure, and purpose" of the statutory language. *O'Connell,* 79 F.3d at 176.

■ Section 1320c–2(f) provides that "[a]ny determination by the Secretary to terminate *or not to renew a contract* under this section shall not be subject to judicial review." 42 U.S.C. § 1320c–2(f) (emphasis added). The language Congress chose in drafting § 1320c–2(f) is simple and straightforward. The statute precludes judicial review of *"[a]ny determination* by the Secretary to terminate or not to renew a contract...." *Id.* (emphasis added). Thus, the plain meaning of the statutory language is crystal clear: courts do not have the authority to review a decision by the Secretary not to renew a PRO contract. The House Report on this legislation provides that the "[t]ermination of an agreement by the Secretary under this provision would not be subject to judicial review." H.R. No. 97–158, 97th Cong., 1st Sess., 333 (1981). While the House Report does not specifically mention § 1320c–2(f), or a decision by the Secretary not to renew a contract, HCRI has offered no evi-

dence supporting the premise that Congress did not intend to foreclose judicial review of a decision not to automatically renew a contract. "Moreover ... the legislative history of § 1320c–2(f) does not disclose any intent on the part of Congress to restrict that provision's outright ban on judicial review of the Secretary's decision to terminate a contract." *Pennsylvania Peer Review Organization, Inc. v. United States,* 50 B.R. 640, 644 (Bankr.M.D.Pa.1985).

The validity of this conclusion is supported both legally and logically by the record. Given the broad grant of discretionary authority the Secretary has in awarding and terminating contracts, *see American Hospital,* 834 F.2d at 1041, it would be illogical for Congress to prohibit judicial review of the termination of an executory contract while permitting courts to review the Secretary's decision not to renew a contract upon the natural expiration of its terms. Measured against the statutory mandate that the Secretary manage the PRO program in such a way as to promote "the *effective, efficient, and economical* delivery of health care services, and [to promote] the quality of services of the type for which [Medicare] payment may be made ...," 42 U.S.C. § 1395y(g) (emphasis added), it is counterintuitive to believe that Congress would permit judicial interference with the Secretary's contracting authority to renew or not to renew a contract.

Section 1320c–2(f) "affords the government the necessary ability to make final decisions regarding [contracts] and the freedom to engage new contractors to review mounting Medicare claims." *Pennsylvania Peer Review Organization,* 50 B.R. at 644. This court concludes that the plain language of § 1320c–2(f), when read in conjunction with the other provisions of the statute, precludes this court from reviewing the Secretary's decision not to automatically renew HCRI's PRO contract. *See Pennsylvania Peer Review Organization,* 50 B.R. at 644; *see also Kwoun v. Southeast Missouri Professional Standards Review Organization,* 811 F.2d 401, 409 n. 14 (8th Cir.1987), *cert. denied,* 486 U.S. 1022, 108 S.Ct. 1994, 100 L.Ed.2d 226 (1988) (noting that the Secretary has the power to terminate a contract with any PRO and that "[s]uch a termination is not subject to judicial review").

### HCRI's Constitutional Challenge

As noted above, HCRI attempts to sidestep the judicial review preclusion required by § 1320c–2(f) by painting its claim as one alleging an infringement of a constitutional right. Because the Supreme Court has called into question any attempt by Congress to preclude constitutional challenges to a statute, *see Weinberger,* 422 U.S. at 762, 95 S.Ct. at 2465, this court will review HCRI's proffered constitutional claim.

■ HCRI's constitutional claim alleges a deprivation of a property interest without due process of law. More specifically, HCRI argues that it has a constitutionally protected property interest in the automatic renewal of its PRO contract. HCRI contends that its alleged property interest "in noncompetitive renewal arises out of a combination of federal statutory and regulatory law as well as the conduct, custom and practice of the agency committed to interpreting and enforcing that law." Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss or, Alternatively, for Summary Judgment at 7. HCRI alleges that the Secretary's practices led to an understanding that nonrenewal would occur only in limited circumstances, and only after HCRI had an opportunity to respond to the reasons for nonrenewal. *Id.*

■ Procedural due process requirements apply only to the "deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). In order to establish a property interest in some form of benefit, a person or entity

"must have more than a unilateral expectation of it. [There] must, instead, [be] a legitimate claim of entitlement to it.... Property interests ... are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitle-

ment to those benefits." *Id.* at 577, 92 S.Ct. at 2709.

Whether a benefit is protected under the Constitution depends upon the "extent to which a person [or entity] has been made secure in the enjoyment of the benefit as a matter of substantive state or federal law." *Beitzell v. Jeffrey,* 643 F.2d 870, 874 (1st Cir.1981). While it is true that reported decisions do not provide an explicit definition for identifying property interests, they "suggest that the more circumscribed is the government's discretion (under substantive state or federal law) to withhold a benefit, the more likely that benefit constitutes 'property'...." *Id.*

HCRI claims that the plain language of the statute supports its claim that it has a legitimate claim of entitlement to noncompetitive renewal. HCRI however, cites no authority in support of its claim that the statutory language creates a constitutionally protected property interest. HCRI bases it argument on the premise that the Secretary has little discretion in implementing the mandate of the statute.

For purposes of analysis of HCRI's statute-based constitutional claim, this court looks to the provisions of 42 U.S.C. § 1320c-2 as they apply to the facts of this case. As previously noted, HCRI is not an "in-state" organization. *See* 42 U.S.C. § 1320c-2(i). Therefore, the Secretary is required to give notice in the Federal Register of the impending expiration of HCRI's contract and to solicit statements of interest from in-state organizations. *See id.* The language of the statute also declares a specific "[p]reference [for] contracting with in-[s]tate organizations." *See id.*

Because HCRI's contract expires by its own terms on June 30, 1996, it was well aware that the Secretary would be required to give notice to, and solicit bids from, in-state organizations. Receipt of a statement of interest by the Secretary does not preclude HCRI from submitting a bid on a competitive basis for the Maine contract. It does, however, eliminate the possibility of a noncompetitive renewal of the current contract. Thus, the only change in HCRI's circumstances is that it will have to submit a competitive bid for the Maine PRO contract if it wishes to be considered.

The statutory framework grants broad discretionary authority to the Secretary. In fact, HHS "has broad discretion in negotiating each [PRO] contract." *American Hospital,* 834 F.2d at 1041. The statute provides that once a contract is awarded, it "shall be renewable" on a triennial basis. 42 U.S.C. § 1320c-2(c)(3). "Renewable" is defined as "able to be renewed." Random House Unabridged Dictionary 1631 (2d ed. 1993). The term "renewable" suggests a permissive function on behalf of the Secretary and would evidence the Secretary's broad discretionary power in deciding whether to renew a contract.

Further evidence of the Secretary's discretionary power is found at 42 U.S.C. § 1320c-2(c)(4). If the Secretary *"intends* not to renew a contract" the statute delineates the timing of the notice to be given to the PRO and the type of information that a PRO may submit in response to the Secretary's decision. 42 U.S.C. § 1320c-2(c)(4) (emphasis added). The statutory scheme does not, however, grant a current contractor the right to inspect or request any information submitted by any other interested organization. The statute simply permits the current contractor to submit information pertinent to *its* performance. 42 U.S.C. § 1320c-2(c)(4). The statute also provides that the Secretary has the authority to perform her duties "without regard to any provision of law relating to the making, performance, amendment, or modification of contracts of the United States *as the Secretary may determine to be inconsistent"* with this section of the statute. 42 U.S.C. § 1320c-2(e)(1) (emphasis added).

The broad scope of the Secretary's discretion is clearly supported by the provision precluding judicial review of "[a]ny determination by the Secretary to terminate or not to renew a contract...." 42 U.S.C. § 1320c-2(f). This discretion is consistent with the power that the statute grants the Secretary to implement the PRO system in an effective, efficient and economical manner. *See* 42 U.S.C. § 1395y(g). To allow a court to control contract terminations and renewals would not only conflict with the purposes

articulated and advanced by the statutory scheme but may also result in an impermissible infringement upon an executive prerogative in violation of the separation of powers doctrine. *See generally Horta v. Sullivan,* 4 F.3d 2, 23 (1st Cir.1993). Furthermore, because HCRI is an out-of-state organization, its expectation of a noncompetitive, *i.e.,* automatic, renewal of the contract is completely unfounded, especially in light of the clear "[p]reference in contracting with in-[s]tate organizations." *See* 42 U.S.C. § 1320c–2(i). The statutory language simply does not support HCRI's claim of entitlement to automatic renewal.

▮▮▮ The contract terms, likewise, do not support HCRI's constitutional argument. Contract interpretation is normally a question of law for the court. *Blackie v. State of Maine,* 75 F.3d 716, 721 (1st Cir.1996). "When a court looks to the words of a document to consider the meaning of those words in the context of the agreement, the search is for manifested meaning, not privately held belief or intent of one party...." *Donoghue v. IBC USA (Publications) Inc.,* 70 F.3d 206, 212 (1st Cir.1995).

In support of its argument, HCRI cites to section H–5 of the contract, entitled "Contract Renewal and Performance Evaluation." Section H–5(a) provides that the contract *"may* be renewed for an additional three (3) year term based upon evaluation by the Secretary of the quality and effectiveness of the organization in carrying out the functions specified in the contract *and a determination by the Secretary to renew."* December 1995 Lynch Affidavit at Exhibit A (emphasis added). The verb "may" denotes a grant of authority that is "merely permissive." *International Cablevision Inc. v. Sykes,* 997 F.2d 998, 1005 (1st Cir.1993). Thus, the use of the term "may" supports this court's determination that the contract's renewal is subject to the discretion of the Secretary. The discretionary authority of the Secretary is further evidenced by the provision that a decision whether to renew is based upon an evaluation of the organization's effectiveness *and* a determination by the Secretary to renew.

The provisions of section H–5(b) of the contract contradict HCRI's argument that it is entitled to information regarding any in-state organization's initial submission of interest. Section H–5(b) of the contract provides that

> "[i]f the Secretary does not intend to renew the contract the contractor shall be notified in writing at least 90 days prior to the contract expiration date. In this case, the contractor shall be given an opportunity to present data, interpretation of data, and other information pertinent to *its* performance under the contract...." December 1995 Lynch Affidavit at Exhibit A (emphasis added).

Consequently, the language of the contract, which the court notes tracks the language of the statute, *see* 42 U.S.C. § 1320c–2(c)(4), does not bestow any right upon HCRI to view the submission of any other in-state organization; nor does it bestow upon HCRI any "right" to respond to the notice of nonrenewal other than to provide data pertinent to its own performance under the contract.

HCRI readily admits that the Secretary's reason for the nonrenewal was as a result of her determination that there was at least one in-state organization interested in becoming the Maine PRO. HCRI concedes that the "Secretary's conduct and practice in this particular nonrenewal is fully consistent with [HCRI's] understanding, with the exception that the Secretary failed to provide the meaningful opportunity to respond to which [HCRI] understood it would be provided." Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss or, Alternatively, for Summary Judgment at 3. HCRI avers that, as a result of the Secretary's July 13 letter, in which Hebbel informed HCRI that it would have an opportunity to respond to the Secretary's rationale for nonrenewal, it was guaranteed access to certain information pertinent to the interested in-state organizations' proposals. *Id.* HCRI suggests that the notice it received was somehow constitutionally deficient because HCRI "did not know how many or which organizations had filed statements of interests" and did not know "what information these organizations had provided to the Secretary in support of the claim that they were qualified to serve as an in-state PRO in

Maine." *Id.* It appears that HCRI requested the information in order for it to determine, and quite possibly litigate, the question of "qualification" of the interested in-state organizations. Without this information HCRI contends that it was unable to prepare a response to the Secretary's decision not to automatically renew its contract.

Neither the statute nor the contract confers any right upon HCRI to review information submitted by other entities. In support of its contention HCRI cites to section H–5 of the contract, however, as discussed above, the contract language provides only that HCRI has the right to submit data and information pertaining to its own performance under the contract. The language of the July 13 letter, while ambiguous, does not alter the terms of the contract or the statute. *See* 42 U.S.C. § 1320c–2(c)(4).

Furthermore, HCRI places undue force upon the term "qualified." In its complaint HCRI alleges that "Federal law, through the United States Code and the Code of Federal Regulations, has established certain requirements for what constitutes a 'qualified' PRO." Plaintiff's Complaint for Declaratory and Injunctive Relief at paragraph 12. In support of this assertion HCRI cites to 42 U.S.C. § 1320c–1(1) and 42 C.F.R. §§ 462.101–462.106. *Id.* These sections, however, do not contain the term "qualified" nor do they define it. The statute defines a PRO as an entity that

> "(1)(A) is composed of a substantial number of the licensed doctors of medicine and osteopathy engaged in the practice of medicine or surgery in the area and who are representative of the practicing physicians in the area; ... or (B) has available to it, by arrangement or otherwise, the services of a sufficient number of licensed doctors of medicine or osteopathy engaged in the practice of medicine or surgery in such area to assure that adequate peer review of the services provided by the various medical specialties and subspecialties can be assured.

(2) is able, in the judgment of the Secretary, to perform review functions required under section 1320c–3 of this title in a manner consistent with the efficient and effective administration of this part and to perform reviews of the pattern of quality of care in an area of medical practice where actual performance is measured against objective criteria which define acceptable and adequate practice; and

(3) has at least one individual who is a representative of consumers on its governing body." 42 U.S.C. § 1320c–1.

The requirements of a physician-sponsored and physician access organization, as generally outlined in § 1320c–1(1)(A), are more specifically described in the Federal Register notice and the Code of Federal Regulations.

The term "qualified" appears in the Federal Register notice, the statute, and in the contract; however, it is not defined.[3] The notice in the Federal Register sets forth the information to be included in a statement of interest. In order to be eligible to be considered for the PRO contract an interested in-state organization must show that (1) its primary place of business is in the review state or that it is owned by a parent corporation whose headquarters is located in the review state; (2) it is a physician-sponsored or a physician-access organization and it is not a health care facility; and, (3) it has at least one individual who is representative of consumers on its governing board. 60 Fed. Reg. at 21825 (1995). The organization must also be able, *"in the judgment of the Secretary,"* to perform PRO review functions. 42 U.S.C. § 1320c–1(2) (emphasis added). Because MMAF identified itself as a physician-access organization and noted that it was not a health care facility it needed to demonstrate to the Secretary that it had "available" to it, by "arrangement or otherwise" a "sufficient number of licensed doctors ... in the review area to assure adequate review." 60 Fed.Reg. at 21825; *see also* 42 U.S.C. § 1320c–1(1)(A); 42 C.F.R. 462.103.

HCRI claims that it is entitled to the information regarding MMAF to determine

---

3. In fact, during the argument on its motion for a preliminary injunction, HCRI could point to no one specific source to support its interpretation of the meaning of the term "qualified." December 13, 1995, Transcript of the Hearing on the Motion for Preliminary Injunction at 34–38.

whether MMAF is a "qualified" in-state organization. In embarking on this journey, however, HCRI adds it own gloss to the term "qualified." Neither the statutory scheme, the Code of Federal Regulations, or the Federal Register notice provide any support for HCRI's proffered definition. The context of the statutory provision within which the term applies suggests that an organization which meets the minimum statutory requirements, *see* 42 U.S.C. § 1320c–1, is "qualified" for the purposes of the submission of a statement of interest. The language of the Federal Register notice illustrates and lends support to this conclusion:

> "If one or more organizations meet the above requirements in a PRO area, and submit statements of interests in accordance with this notice, HCFA will consider those organizations to be *potential sources* for the aforementioned contracts upon their expiration. These organizations will be entitled to participate in a full and open competition for the PRO contract to provide medical review services." 60 Fed. Reg. at 21825 (emphasis added).

HCRI's insistence that it has a right to MMAF"s submission in order to challenge MMAF"s qualifications flies in the face of the clear statutory mandate giving the Secretary discretion to determine whether an in-state organization meets the minimal statutory requirements to trigger the provisions of 42 U.S.C. § 1320c–2(i). Consequently, HCRI's claim that it was guaranteed access to MMAF"s statement of interest is unfounded.

▆▆ Last, citing *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), HCRI contends that a property right arose as a result of the understandings it had with the Secretary. HCRI alleges that it had a reasonable expectation that its contract would be renewed absent legitimate reasons

for nonrenewal—either performance deficiencies or the interest of a "qualified" in-state organization—determined only after HCRI had been provided with a meaningful opportunity to respond to the Secretary's determination that an in-state organization had expressed an interest in submitting a proposal.[4]

HCRI contends that because the Secretary had always automatically renewed its contract in the past, her conduct, custom and practice, when combined with the language of the statute and the contract, create a property right in the automatic renewal of its contract. This argument clearly misses the mark. In carving out this argument HCRI continues to ignore the legal significance of the entrance on the scene of an interested in-state organization and the constraints of § 1320c–2(i). Glossing over the import of these factors, HCRI's claim in this regard rests upon its belief that, because the Secretary has automatically renewed its contract in the past, she has created an expectancy of automatic renewal to which it is now entitled. Conspicuously absent from its assertion however, is the indispensable corollary; *i.e.*, that in the past the contract had been automatically renewed even though the Secretary had received a statement of interest from an in-state organization. Thus, the comparison advanced by HCRI is fatally flawed and renders its conduct, custom and practice argument wholly without merit.

This court concludes that HCRI has failed to demonstrate that it has a legitimate entitlement to the automatic renewal of its contract. HCRI's claim to the automatic renewal of its PRO contract does not rise above the level of a mere unilateral expectancy; consequently it has failed to establish that it has a constitutionally protected property interest. *See generally Webb's Fabulous Pharmacies Inc. v. Beckwith*, 449 U.S. 155, 161, 101 S.Ct. 446, 451, 66 L.Ed.2d 358 (1980).

---

4. In support of the assertion that it would be provided a *meaningful opportunity* to respond HCRI asserts that "[b]y comparison, when the Secretary determined not to renew Health Care Review's Rhode Island PRO contract, she provided specific information related to the company's performance under the contract...." Plaintiff's Memorandum of Law in Opposition to Defen-

dants' Motion to Dismiss or, Alternatively, for Summary Judgment at 4 n. 2. HCRI's assertion regarding the Secretary's conduct surrounding its Rhode Island contract is irrelevant. HCRI continues to overlook the statutory ramifications of the filing of MMAF's statement of interest and the statutory scheme's clear preference for contracting with in-state organizations.

Having found no support for HCRI's constitutional challenges to the Secretary's action, this Court grants the Secretary's motion to dismiss for lack of subject matter jurisdiction.