SUMMIT INVESTMENT AND DEVEL-
OPMENT CORPORATION, Plain-
tiff, Appellant,

v.

Edward G. LEROUX, Jr.,
Defendant, Appellee.

SUMMIT INVESTMENT AND DEVEL-
OPMENT CORPORATION, Plain-
tiff, Appellant,

v.

Albert F. CURRAN, Sr., Defendant,
Appellee.

Nos. 94–2212, 94–2213.

United States Court of Appeals,
First Circuit.

April 7, 1995.

Decided Nov. 13, 1995.

Stephen F. Gordon, with whom Stanley W. Wheatley and Gordon & Wise, Boston, MA, were on brief, for appellant.

Andrew C. Griesinger, with whom Paul D. Moore, Theodore A. Lund and Choate, Hall & Stewart, Boston, MA, were on brief, for appellees.

Before TORRUELLA, Chief Judge, CYR and BOUDIN, Circuit Judges.

CYR, Circuit Judge.

Summit Investment and Development Corporation ("Summit"), one of three general partners in Belle Isle Limited Partnership, a Massachusetts limited partnership, appeals from a district court order affirming a bankruptcy court ruling denying Summit's claims for declaratory and injunctive relief against its two other general partners, debtors-in-possession Edward G. Leroux, Jr. and Albert F. Curran, Sr. The bankruptcy court held that Bankruptcy Code § 365(e) preempted certain provisions in the limited partnership agreement which purported to convert the general partnership interests held by Leroux and Curran into limited partnership interests immediately upon the filing of their respective chapter 11 petitions. We affirm.

# I

## BACKGROUND

Pursuant to written agreements [hereinafter, collectively: "Agreement"], Leroux, Curran, and Summit became the general partners in Belle Isle Limited Partnership.[1] The general partners acquired the *exclusive right* to manage the business of the partnership by majority vote. Leroux was designated "managing general partner," which empowered him to conduct day-to-day partnership affairs. In the event a general partner were to file for bankruptcy, however, Section 7.5E of the Agreement purportedly converted the general partner's interest into a limited partnership interest, divesting the bankrupt partner of the contract right to participate in partnership management unless all remaining partners otherwise agreed. *See* Agreement § 7.5E (also referred to as, *"ipso facto* provision"); *see also* Mass.Gen.Laws Ann. ch. 109, § 23(4) (Massachusetts Limited Partnership Act) ("MLPA § 23(4)").[2]

In October 1992, appellee Leroux filed a voluntary chapter 11 petition. Curran soon followed suit. Although Summit maintained that Section 7.5E automatically divested Leroux and Curran of their general partnership interests, and, by extension, ousted Leroux as the managing general partner, Leroux continued to act as Belle Isle's managing general partner, and appellee Curran as a general partner.

Summit initiated these adversary proceedings in June 1993, seeking a judicial declaration that appellees' general partnership interests terminated upon the filing of their voluntary chapter 11 petitions by operation of the *ipso facto* provisions in Section 7.5E and MLPA § 23(4). Summit requested injunctive relief ousting appellees from any management role in Belle Isle. Leroux and Curran responded that Bankruptcy Code section 365(e) preempts contractual and statutory *ipso facto* provisions that purport to terminate contract rights solely because a contracting party institutes bankruptcy proceedings.

# II

## DISCUSSION

The bankruptcy court entered judgment for Leroux and Curran, *see Summit Inv. & Dev. Corp. v. LeRoux (In re LeRoux)*, 167

---

1. Each general partner owned a 1% interest *qua* general partner, and a 9% interest *qua* limited partner. Belle Isle sold the remaining 70% ownership interest to other investors, who became limited partners.

2. MLPA § 23(4) provides, in pertinent part:
   Except as approved by the specific written consent of all partners at the time, a person ceases to be a general partner of a limited partnership upon the happening of any of the following events: ... (4) Unless otherwise provided in writing in the partnership agreement the general partner ... (ii) files a voluntary petition in bankruptcy; (iii) is adjudicated bankrupt or insolvent; [or] (iv) files a petition or answer seeking for himself any reorganization ... or similar relief under any statute, law or regulation....

B.R. 318 (Bankr.D.Mass.1994), and the district court affirmed on intermediate appeal, *see Summit Inv. & Dev. Corp. v. LeRoux*, Nos. 94–11251–DPW, 94–11252–DPW, 1995 WL 447800 (D.Mass. Oct. 20, 1994). We review the bankruptcy court's factual findings for clear error and the district court's rulings of law *de novo*. *See Indian Motocycle v. Massachusetts Hous. Fin. Agency (In re Indian Motocycle)*, 66 F.3d 1246, 1249 (1st Cir.1995); *In re LaRoche*, 969 F.2d 1299, 1301 (1st Cir.1992).

■ Statutory interpretations are subject to plenary review. *See In re Erin Food Servs., Inc.*, 980 F.2d 792, 799 (1st Cir.1992). The "plain meaning" of statutory language controls its construction. *See Laracuente v. Chase Manhattan Bank*, 891 F.2d 17, 21–22 (1st Cir.1989). But the meaning, or "plainness," of discrete statutory language is to be gleaned from the statute *as a whole*, *see Little People's Sch., Inc. v. United States*, 842 F.2d 570, 573 (1st Cir.1988), including its overall policy and purpose, *see Wilcox v. Ives*, 864 F.2d 915, 926 (1st Cir.1988). "Literal" interpretations which lead to absurd results are to be avoided. *See Sullivan v. CIA*, 992 F.2d 1249, 1252 (1st Cir.1993).

■ Plain statutory language does not prompt recourse to countervailing legislative history. *See United States v. Bohai Trading Co., Inc.*, 45 F.3d 577, 581 (1st Cir.1995). On the other hand, the congressional intendment conveyed by unclear statutory language may be discernible from its legislative history. *See O'Neill v. Nestle Libbys P.R., Inc.*, 729 F.2d 35, 36 (1st Cir.1984). Nevertheless, federal preemption under the Supremacy Clause, *see* U.S. Const. art. VI, cl. 2, will be found only if there is "clear" evidence of a congressional intent to preempt state law, or we are persuaded that the federal and state statutes, by their very terms, cannot coexist. *See Greenwood Trust Co. v. Commonwealth of Mass.*, 971 F.2d 818, 828 (1st Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 974, 122 L.Ed.2d 129 (1993).

*A. Preemption Under Bankruptcy Code § 365(e)(1)*

■ The preemptive effect of Bankruptcy Code § 365(e) upon a partnership agreement is a question of first impression in this circuit. Generally speaking, until the enactment of the Bankruptcy Reform Act of 1978, unambiguous contractual *ipso facto* provisions such as Section 7.5E were *enforceable* against chapter 11 debtors, debtors in possession, and their estates. Congress reversed course in 1978, however, with its enactment of various Code provisions, *see* Bankruptcy Code §§ 365(e), 365(f), 541(c), which invalidate contractual *ipso facto* provisions for the reason that automatic termination of a debtor's contractual rights "frequently hampers rehabilitation efforts" by depriving the chapter 11 estate of valuable property interests at the very time the debtor and the estate need them most. S.Rep. No. 989, 95th Cong., 2d Sess. 59 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5845.

Summit's first contention turns on one such Code provision, Bankruptcy Code § 365(e)(1), which states in relevant part:

Notwithstanding a provision in an executory contract or unexpired lease, *or in applicable law*, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case *solely because of a provision in such contract* or lease that is conditioned on—

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title; or

(C) the appointment of or taking possession by a trustee in a case under this title . . . .

11 U.S.C. § 365(e)(1) (emphasis added).[3]

Summit argues that the general partnership interests held by LeRoux and Curran

---

**3.** The bankruptcy court below found—and the parties do not contest on appeal—that the Agreement is an "executory contract," presumably because each general partner owed ongoing duties

of performance to the other general partners. *See Summit Inv. & Dev. Corp.*, Nos. 94–11251–DPW, 94–11252–DPW, 1995 WL 447800, at *3–4 (D.Mass. Oct. 20, 1994); *see also In re Catron*,

were not terminated "*solely* because of a provision in [the partnership] *contract,*" because the Massachusetts limited partnership *statute, see* MLPA § 23(4); *supra* note 2, operated *independently* to terminate the general partnership interests immediately upon the filing of their voluntary chapter 11 petitions. *Accord Matter of Phillips,* 966 F.2d 926, 935 (5th Cir.1992).[4] The plain language of section 365(e)(1), as Summit views it, invalidates only *private contractual ipso facto* clauses, thus suggesting that Congress intended to respect the States' prerogative to enact *statutory ipso facto* provisions where the legislature determines that such provisions serve important purposes (e.g., preventing overreaching by contracting parties). We think its interpretation is unsound.

First, Summit's interpretation does not come to terms with the prefatory clause in section 365(e)(1), which plainly provides that the invalidation of contractual *ipso facto* clauses under section 365(e)(1) appertains "[n]otwithstanding a [supplemental termination] provision in applicable law;" that is to say, for example, in a state statute which in its own right would require automatic termination of a contract or contract right upon the filing of a bankruptcy petition. Thus, the effects of MLPA § 23(4) are nullified by section 365(e)(1). Given the plain language of this prefatory clause, the word "solely"—though oddly placed—is more faithfully read to modify the word "conditioned," thereby clarifying that contractual termination clauses that are triggered by *conditions other than* the three listed in subsections 365(e)(1)(A), (B), and (C), would *not* be invalidated by operation of section 365(e)(1).

Second, even if this "plain language" reading were less conclusive, Summit has not cited, nor have we found, any legislative history supporting its suggested distinction between statutory and contractual *ipso facto* provisions. We are left, then, with no rationale which would warrant the categorical conclusion that Congress recognized a State interest sufficiently compelling to outweigh the important rehabilitative policies that section 365(e) was designed to serve.[5] Nor has Summit suggested a sound basis for concluding that Congress considered statutory *ipso facto* provisions a lesser impediment to chapter 11 rehabilitation efforts than contractual *ipso facto* clauses.

### B. *The Preemption Exception in Bankruptcy Code § 365(e)(2)(A)*

Summit's second contention relies on Bankruptcy Code § 365(e)(2)(A), one of two express *exceptions* to the *ipso facto* provision ban in section 365(e)(1):

> Paragraph (1) of this subsection [365(e)] does *not* apply to an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—
>
> > (A)(i) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance *to the trustee or to an assignee* of such contract or lease, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

---

158 B.R. 629, 634 (E.D.Va.1993) (collecting cases supporting majority rule that partnership agreements generally are deemed "executory contracts" governed by Bankruptcy Code § 365), *aff'd,* 25 F.3d 1038 (4th Cir.1994).

4. The district court, in its able opinion, correctly noted that the *Phillips* language upon which Summit relies is dicta-within-dicta. *See Summit Inv. & Dev. Corp.,* Nos. 94–11251–DPW, 94–11252–DPW, 1995 WL 447800, at *11–12 n. 4 (D.Mass. Oct. 20, 1994). After finding that the federal preemption claim had not been preserved below, the *Phillips* court disposed of it by con-

cluding that the contract at issue was no longer "executory," thus not controlled by § 365. *See Phillips,* 966 F.2d at 928.

5. Moreover, were Massachusetts intent on preventing overreaching, one might reasonably expect that MLPA § 23(4), *see supra* note 2, would have been drafted to *foreclose* parties from contracting to permit any bankrupt general partner from continuing to participate in partnership management. Instead, it simply supplies an *ipso facto* provision where one is not "otherwise provided in the partnership agreement."

(ii) such party does not consent to such assumption or assignment....

11 U.S.C. § 365(e)(2) (emphasis added).

A proper construction of section 365(e)(2)(A) requires consideration of companion section 365(c) as well, which governs the related question whether a trustee or debtor in possession may *assume* an executory contract that the nondebtor party claims to be "nonassignable" under applicable nonbankruptcy law:

The trustee *may not assume or assign* any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—

(1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance *to an entity other than the debtor or the debtor in possession*, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; *and*

(B) such party does not consent to such assumption or assignment....

11 U.S.C. § 365(c)(1) (emphasis added).

Summit contends that section 365(e)(2)(A), by its plain language, posits a purely "hypothetical" test for determining whether a particular executory contract, or constituent contract right, comes within its exception. That is to say, even though Leroux and Curran have not yet attempted (and may never attempt) to assume, or to *assign* to a third party, their partnership "management" and "participation" rights under the Agreement, Summit maintains that in order to come within the section 365(e)(2)(A) exception it need only establish that the Agreement is deemed "nonassignable" under state law. In this case, the Massachusetts limited partnership statute is, quite literally, an "applicable [nonbankruptcy] law excus[ing] a party, oth-

er that the debtor [viz., Summit] ... from accepting performance from or rendering performance to ... an *assignee* of such contract" because it precludes general partners from assigning their general partnership "participation" interests to a third party. *See* Mass.Gen.Laws Ann. ch. 109, § 40.[6] According to Summit, therefore, the contract rights held by Leroux and Curran terminate without regard to whether they ever contemplated assigning their "management" or "participation" rights under the Agreement. We cannot agree with its interpretation, for several reasons.

First, though Summit's "hypothetical" approach to construing the nonassignability provisions in § 365(e)(2)(A) and 365(c)(1)(A) is not *precluded* by the literal statutory language, it is at least as plausible to construe these provisions as requiring an *actual* showing—prior to any termination of the debtor's postpetition contract rights—that the nondebtor party (Summit) would not be forced to accept performance under its executory contract from someone other than the debtor party with whom it originally contracted; viz., that the nondebtor party would not be placed at the mercy of the debtor party by what *amounts to an actual* "assignment" of the debtor party's contract rights. Such might be the case, for example, were Summit forced to accept performance—under a "nonassignable" executory contract—from the chapter 11 *trustee* of an individual (i.e., noncorporate) chapter 11 debtor, rather than from the debtor himself.

■ Second, because the statutory language is ambiguous and open to more than one plausible interpretation, we look to its legislative history, *see O'Neill*, 729 F.2d at 36:

[T]his section *will require the courts to be sensitive* to the rights of the non-debtor party [viz., Summit] to executory contracts and unexpired leases. If the trustee is to

**6.** Section 40 provides:

Except as provided in the partnership agreement, a partnership interest is assignable in whole or in part. An *assignment* of a partnership interest *shall not* dissolve a limited partnership or *entitle the assignee to become or to exercise any rights of a partner.* An assignment entitles the assignee to receive, to the extent assigned, only the distribution to which the assignor would be entitled. Except as provided in the partnership agreement, a partner ceases to be a partner upon assignment of all of his partnership interest. (Emphasis added.)

assume a contract or a lease, the court will have to ensure that the trustee's performance under the contract or lease gives the other contracting party the *full benefit of his bargain.*

S.Rep. No. 989, 95th Cong., 2d Sess. 59 (1978), *reprinted in* 1980 U.S.C.C.A.N. 5787, 5845 (emphasis added). This passage pointedly suggests that Congress did not envision the abstract analysis proposed by Summit, but contemplated a case-by-case inquiry into the *actual* consequences—to the nondebtor party—of permitting these executory contracts to be performed by the debtor party following the institution of bankruptcy proceedings. In other words, where a debtor or debtor in possession bears the burden of performance under an executory contract, the nondebtor party to whom performance is due must make an individualized showing that it would not receive the "full benefit of [its] bargain" were an entity to be substituted for the debtor from whom performance is due.

The historical evidence of legislative intent is buttressed by the 1984 amendment to section 365(c)(1), and its legislative history. Before the 1984 amendment, the pivotal language in section 365(c) read precisely like the current version of section 365(e)(2); that is, it adverted to the "applicable law excus[ing] a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance *to the trustee or to an assignee* of such contract or lease. . . ." In replacing the highlighted language in section 365(c) with the phrase "to an entity other than the debtor or the debtor in possession," Congress intended to—

make [ ] clear that the prohibition against the trustee's power to assume an executory contract does not apply where it is the debtor that is in possession and the performance to be given or received under a personal service contract will be the same

as if no petition had been filed because of the personal nature of the contract.

H.R.Rep. No. 1195, 96th Cong., 2d Sess. § 27(b) (1980). Since debtors-in-possession Leroux and Curran fit squarely within the category described in the amended version, section 365(c) presents no bar to their *assumption* of the Agreement.

Summit argues, however, that this "post"-enactment legislative history is not useful because Congress inexplicably chose, in 1984, *not* to alter the corresponding language in *section 365(e)(2)(A).* Given the interrelated concerns addressed by sections 365(c) and 365(e)(2), however, we think Congress contemplated in 1984 that section 365(e)(2) would permit a debtor or a debtor in possession to avoid *automatic termination* of his executory contract rights under the section 365(e)(2)(A) exception. Were this not so, an absurd result would eventuate: there would be no contractual right left for a debtor or debtor in possession to *assume* under section 365(c)(1) because it would already have been terminated automatically under section 365(e). *See Sullivan,* 992 F.2d at 1252 (disfavoring statutory interpretation leading to absurd results).

Third, the "hypothetical" test posited by Summit implicitly rests on the discredited notion that Leroux and Curran, in their capacities as *prepetition* debtors, effectively (though not literally) "assigned" their contract rights *to themselves* in their capacities as postpetition debtors in possession. Summit says it is inherently disadvantaged by having to continue dealing with Leroux and Curran, just as it would be were they to assign their contract rights to a third party, or to a complete "stranger" to the original Agreement. For example, Summit alleges that Leroux and Curran currently are acting under an inherent conflict of interest, in that they owe *conflicting* fiduciary duties *both* to their co-partners *and* to their chapter 11 creditors.[7] This contention fails as well.

---

7. Summit contends that Leroux and Curran have rejected a loan restructuring which would have been in the best interests of the Belle Isle partnership, based on their opinion that the restructuring would be disadvantageous to their creditors. In its complaint, however, Summit relied entirely on the automatic nature of the statutory

and contractual termination clauses in the Agreement, and did not ask the bankruptcy court to make factual findings concerning the alleged breach of fiduciary duty. Accordingly, the court made no such findings, and we deem Summit's claim waived. *See Monarch Life Ins. Co. v.*

Mirroring the 1984 legislative history discussed above, pertinent Supreme Court decisions diminish the legal "fiction" that the prepetition debtor and the postpetition debtor are to be treated as though they were *separate* legal entities, *see National Labor Relations Bd. v. Bildisco & Bildisco,* 465 U.S. 513, 528, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1984), thereby undermining Summit's thesis that the postpetition "change" in contract performance is sufficiently substantial—in and of itself—to deprive parties like Summit of the full benefit of their bargain. *See, e.g., In re James Cable Partners, L.P.,* 154 B.R. 813, 815 (M.D.Ga. 1993), *aff'd,* 27 F.3d 534 (11th Cir.1994); *In re Cardinal Indus., Inc.,* 116 B.R. 964, 981 (Bankr.S.D.Ohio 1990). Significantly, the leading case endorsing the "hypothetical" test, *see In re Catron,* 158 B.R. 629 (E.D.Va. 1993), *aff'd,* 25 F.3d 1038 (4th Cir.1994), neither cites nor discusses *Bildisco.*

Finally, Summit's categorical assumption that an inherent conflict of interest exists in all instances directly contravenes the tenor of section 365(e)'s legislative history, which contemplates that courts undertake a fact-"sensitive" inquiry to determine whether or not, in the circumstances of the particular case, nondebtor parties like Summit can nonetheless obtain the "full benefit" of their bargain. In no sense can Summit be compelled to settle for performance from entities whose management expertise and skill is demonstrably inferior to that required of its debtor parties, Leroux and Curran. Further, as co-partners, should Leroux and Curran not render the "full benefit of [Summit's] bargain" due to an *actual* conflict of interest, the bankruptcy court would be required to weigh such a conflict in evaluating whether Leroux and Curran may assume the contract under section 365(c)(1).[8]

## III

### CONCLUSION

For the foregoing reasons, we hold that section 365(e), in the circumstances of this case, preempts enforcement of the *ipso facto* termination provisions in Section 7.5E of the Agreement and in MLPA section 23(4).

***The judgment of the district court is affirmed. Costs to appellees.***

*Ropes & Gray (In re Monarch Capital Corp.),* 65 F.3d 973, 981 n. 10 (1st Cir.1995).

8. Our interpretation of Bankruptcy Code § 365(c) and (e) makes it unnecessary to address the district court's discussion relating to the preemptive effect of Bankruptcy Code § 541(c)(1). *See Summit Inv. & Dev. Corp.,* Nos. 94–11251–DPW, 94–11252–DPW, 1995 WL 447800, at \*\*14–15 (D.Mass. Oct. 20, 1994).