UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 96-2028

INSTITUT PASTEUR AND PASTEUR SANOFI DIAGNOSTICS,

Appellants,

v.

CAMBRIDGE BIOTECH CORPORATION,

Appellee.

 

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge] 

 

Before

Cyr, Boudin and Lynch,

Circuit Judges. 

 

Jeffrey D. Sternklar, with whom Michael Gottfried and Burns & 
Levinson LLP were on brief for appellants.  
Joseph F. Ryan, with whom Jeffrey L. Jonas, Anthony L. Gray, 
Andrew P. Strehle and Brown, Rudnick, Freed & Gesmer, P.C. were on 
brief for appellee.

 

January 17, 1997
 

CYR, Circuit Judge. Unsuccessful in their intermedi- CYR, Circuit Judge. 

ate appeal to the district court, Institut Pasteur and Pasteur

Sanofi Diagnostics [collectively: "Pasteur"] again appeal from

the bankruptcy court order which confirmed the chapter 11 reorga-

nization plan ("Plan") proposed by debtor-in-possession Cambridge

Biotech Corporation ("CBC"), the holder of two licenses to

utilize Pasteur patents. The Plan provision central to the

present dispute calls for the sale of all CBC stock to a subsid-

iary of bioMerieux Vitek, Inc. ("bioMerieux"), a major competitor

of appellant Pasteur. Finding no error, we affirm.

I I

BACKGROUND BACKGROUND 

CBC manufactures and sells retroviral diagnostic tests

for detecting the human immunodeficiency virus (HIV) associated

with AIDS. Its HIV diagnostics division annually generates

approximately $14 million in revenues. Institut Pasteur, a

nonprofit French foundation engaged in AIDS-related research and

development, owns various patented procedures for diagnosing HIV

Virus Type 2 ("HIV2 procedures"). Pasteur Sanofi Diagnostics

holds the exclusive right to use and sublicense Institut

Pasteur's patents.

In October 1989, CBC and Pasteur entered into mutual

cross-license agreements, whereby each acquired a nonexclusive

perpetual license to use some of the technology patented or

licensed by the other. Specifically, CBC acquired the right to

incorporate Pasteur's HIV2 procedures into any diagnostic kits

2

sold by CBC in the United States, Canada, Mexico, Australia, New

Zealand and elsewhere.1 

Each cross-license broadly prohibits the licensee from

assigning or sublicensing to others. See Royalty-Free Cross- 

License, at 7.1; Royalty-Bearing Cross-License, at 8.1 ("[N]o

other person shall acquire or have any right under or by virtue

of this Agreement."). Nevertheless, either Pasteur or CBC was

authorized to "extend to its Affiliated Companies the benefits of

this Agreement so that such party shall remain responsible with

regard [to] all [license] obligations." Id. 1.4. "Affiliated 

Company" is defined as "an organization which controls or is

controlled by a party or an organization which is under common

control with a party." Id. 

CBC filed its chapter 11 petition on July 7, 1994, and

thereafter continued to operate its retroviral diagnostic testing

business as debtor-in-possession. Its reorganization plan

proposed that CBC assume both cross-licenses, see 11 U.S.C. 365 

(executory contracts),2 continue to operate its retroviral

diagnostics division utilizing Pasteur's patented HIV2 proce-

dures, and sell all CBC stock to a subsidiary of bioMerieux, a

giant French biotechnology corporation and Pasteur's direct

 

1These cross-licenses expressly provide that Massachusetts
law governs their interpretation. See Royalty-Free Cross-Li- 
cense, at 9; Royalty-Bearing Cross-License, at 10. 

2The parties agree that the cross-licenses are "executory
contracts," since substantial performance remains due by both
parties. See Summit Inv. & Dev. Corp. v. Leroux (In re Leroux), 
69 F.3d 608, 610 n.3 (1st Cir. 1995).

3

competitor in international biotechnology sales. Pasteur previ-

ously had licensed bioMerieux to use its HIV2 procedures, but the

earlier license related to a single product manufactured by

bioMerieux (i.e., bioMerieux's VIDAS automated immunoassay test 

system), and applied only to VIDAS sales in markets other than 

the United States, Canada, Mexico, Australia, and New Zealand,

markets expressly encompassed within the CBC cross-licenses. 

Not surprisingly, in due course Pasteur objected to the

Plan. Citing Bankruptcy Code 365(c), 11 U.S.C. 365(c), it

contended that the proposed sale of CBC's stock to bioMerieux

amounted to CBC's assumption of the patent cross-licenses and

their de facto "assignment" to a third party in contravention of 

the presumption of nonassignability ordained by the federal

common law of patents, as well as the explicit nonassignability

provision contained in the cross-licenses. Isabelle Bressac,

Pasteur's licensing director, attested that Pasteur would not

have granted its competitor, bioMerieux, or a subsidiary, a

patent license under the terms allowed CBC.  

The bankruptcy court authorized CBC to assume the

cross-licenses over Pasteur's objection. It ruled that the

proposed sale of CBC stock to bioMerieux did not constitute a de 

facto "assignment" of the cross-licenses to bioMerieux, but 

merely an assumption of the cross-licenses by the reorganized

debtor under new ownership, and that Bankruptcy Code 365(c)

enabled CBC to assume the cross-licenses as debtor-in-possession

because the prepetition licensing relationship between Pasteur

4

and CBC was neither "unique" nor "something in the category of a

personal services contract." In re Cambridge Biotech Corp., No. 

94-43054, slip op. at 17-18, 24 (Bankr. D. Mass. Sept. 18, 1996);

Tr. 176-77.3 The district court upheld the bankruptcy court

ruling on intermediate appeal. 

II II

DISCUSSION DISCUSSION 

A. Appellate Jurisdiction A. Appellate Jurisdiction 

Citing our decision in Rochman v. Northeast Utils. 

Serv. Group (In re Public Serv. Co. of N.H.), 963 F.2d 469 (1st 

Cir.) ("Public Service"), cert. denied, 506 U.S. 908 (1992), CBC 

now moves to dismiss the appeal for lack of appellate jurisdic-

tion. It contends that Pasteur failed to pursue all available

remedies for preserving a temporary stay of the confirmation

order pending appeal after this court lifted the temporary stay

on October 9, 1996.4 See Trone v. Roberts Farms, Inc. (In re 

Roberts Farms, Inc.), 652 F.2d 793, 798 (9th Cir. 1981) (noting 

that appellant should file motion to stay judgment with Circuit

 

3The bankruptcy court further found that the Plan had been
proposed in good faith, see 11 U.S.C. 1129(a)(3), and that the 
stock sale to bioMerieux had been negotiated in good faith and at
arm's length. In re Cambridge Biotech Corp., No. 94-43054, slip 
op. at 7, 12.

4A series of stays had prevented CBC from consummating the
Plan by August 2, 1996, as scheduled, and a final consummation
date was set for October 31, 1996. In early October, CBC asked
this court to vacate the pending stay, claiming that further
delay threatened irreparable injury. It represented that almost
half its employees had quit during the preceding year, jittery
clients had begun to cancel contracts, and that its revenues had
declined by 10%.

5

Justice if necessary). Since CBC substantially consummated its 

Plan on October 21, 1996, it argues that Pasteur can no longer be

afforded complete relief because neither this court nor the

bankruptcy court has jurisdiction over the many third parties

affected by, and much of the res distributed pursuant to, the 

consummated Plan. Finally, CBC argues, no court can now provide

Pasteur with meaningful partial relief, such as selective rescis-

sion of the stock sale or the cross-license assumption/assignment

provisions, because retention of these cross-licenses by CBC is

indispensable to any successful reorganization of its retroviral

diagnostics business, and, from bioMerieux's standpoint, is a

"deal-busting" component of the Plan. See Plan IX.B.2.a 

("[P]rovisions of the Confirmation Order are nonseverable and

mutually dependent."). We disagree.

Contrary to CBC's suggestion, our Public Service 

decision does not reduce to the simplistic theme that appellate

courts invariably are deprived of jurisdiction by the lack (or

premature dissolution) of a stay which results in substantial

plan consummation prior to final disposition of the appeal.

Rather, we rested our decision in Public Service primarily on two 

circumstantial considerations. See In re Andreuccetti, 975 F.2d 

413, 418 (7th Cir. 1992) (noting that Public Service contem- 

plates that "'[t]he court should reach a determination upon close

consideration of the relief sought in light of the facts of the

particular case'") (citation omitted). 

First, the equities weighed heavily against the appel-

6

lants in Public Service, who repeatedly and inexplicably failed 

to avail themselves of interlocutory appeals from earlier denials

of their requests for stay by the courts below. As a consequence

of their notable lack of diligence, a full sixteen months had

elapsed from the date of confirmation, during which "implementa-

tion of the confirmed plan proceeded apace." In re Public Serv., 

963 F.2d at 472. In contrast, Pasteur assiduously preserved its

stay throughout the three-month period which elapsed following

confirmation, and, on the day this court dissolved the temporary

stay, we expedited the Pasteur appeal. 

Second, Public Service involved extraordinarily intri- 

cate Plan provisions, as well as a multi-billion dollar enter-

prise, with the result that any attempted Plan dismantling

following the substantial and unexcused lapses by appellants

would have produced "'a nightmarish situation for the bankruptcy

court on remand.'" Id. at 474 (citation omitted); see, e.g., 

Baker & Drake, Inc. v. Public Serv. Comm'n of Nev., 35 F.3d 1348, 

1351-52 (9th Cir. 1994) (finding appellate jurisdiction, and

noting that reorganization plan at issue was "not a complex,

billion-dollar affair" like the plans in Trone and Public Ser- 

vice). Although the CBC Plan is not without its own complexi- 

ties, CBC is a much less complex enterprise than Public Service,

and its Plan was substantially consummated much more recently in

relation to the date of appeal.5 
 

5The equitable and pragmatic tests employed in Public 
Service are symbiotic. See In re UNR Indus., 20 F.3d 766, 769 
(7th Cir.), cert. denied, 115 S. Ct. 509 (1994) ("There is a big 

7

We need not resolve the jurisdictional challenge urged

upon us by CBC, however, since the merits of Pasteur's contention

that CBC's assumption of the cross-licenses and its sale of

stock to the bioMerieux subsidiary contravene Bankruptcy Code 

365(c) are readily dispatched. See Casco N. Bank. N.A. v. DN 

Assocs. (In re DN Assocs.), 3 F.3d 512, 515 (1st Cir. 1993) 

(noting that appellate court may bypass jurisdictional questions

where appeal would falter on merits even assuming jurisdiction)

(citing Norton v. Mathews, 427 U.S. 524, 532 (1976)). 

B. The Merits6 B. The Merits 

Pasteur argues that the CBC Plan effects a de facto 

assignment of its two cross-licenses to bioMerieux, contrary to

Bankruptcy Code 365(c)(1) which provides as follows: 

The trustee [viz., CBC]7 may not assume or 
assign any executory contract . . . , whether
or not such contract . . . prohibits or re-
stricts assignment of rights or delegation of
duties, if 

(1)(A) applicable law excuses a party[]
other than the debtor[] [viz., Pasteur] 
to such contract . . . from accepting
 

difference between inability to alter the outcome (real mootness)
and unwillingness to alter the outcome ('equitable mootness'),"
and "[u]sing one word for two different concepts breeds confu-
sion"; instead, appellate courts ultimately must ask "whether it
is prudent to upset the plan of reorganization at this late
date.") (citations omitted). 

6We review the district court's conclusions of law de novo 
and the bankruptcy court's findings of fact for clear error only.
See Petit v. Fessenden, 80 F.3d 29, 32 (1st Cir. 1996). 

7As debtor-in-possession, CBC has substantially the same
rights and powers as a chapter 11 trustee, including the power to
assume executory contracts under Bankruptcy Code 365. See 11 
U.S.C. 1107.

8

performance from or rendering perfor-
mance to an entity other than the debtor
or the debtor in possession, whether or
not such contract . . . prohibits or re-
stricts assumption or assignment; and 

(B) such party [viz., Pasteur] does not 
consent to such assumption or assignment
. . . .

11 U.S.C. 365(c)(1). 

Pasteur argues that in order to encourage optimum

product innovation the federal common law of patents presumes

that patent licensees, such as CBC, may not sublicense to third

parties absent the patent holder's consent. See, e.g., Commis- 

sioner v. Sunnen, 333 U.S. 591, 609 (1948). This federal common 

law rule of presumptive nonassignability thus qualifies as an

"applicable law," within the meaning of Bankruptcy Code 

365(c)(1)(A), which precludes Pasteur from being compelled to

accept performance from any entity other than CBC e.g., 

bioMerieux's subsidiary and therefore prevents CBC from either 

assuming or assigning these cross-licenses. See Everex Sys., 

Inc. v. Cadtrak Corp. (In re CFLC, Inc.), 89 F.3d 673, 679-80 

(9th Cir. 1996) (federal patent law of nonassignability preempts

state law relating to patent license assignability). Further,

says Pasteur, even assuming that section 365(c) might allow a

debtor simply to assume the cross-licenses without a subsequent 

assignment to a third party, CBC formally structured this Plan 

transaction as an assumption by the debtor-in-possession, whereas

in substance it was an assignment of the cross-licenses to 

bioMerieux, a complete stranger to the original cross-licensing

9

agreements. 

These contentions are foreclosed by our decision in

Summit Inv. & Dev. Corp. v. Leroux (In re Leroux), 69 F.3d 608 

(1st Cir. 1995),8 which analyzed and interpreted companion

Bankruptcy Code subsections 365(c) and (e) and their relevant

legislative history.9 As in the present case, in Leroux we were 

urged to interpret subsections 365(c) and (e) as mandating a

"hypothetical test." Under such an approach, the chapter 11

debtor would lose its option to assume the contract, even though 

it never intended to assign the contract to another entity, if

either the particular executory contract or the applicable

nonbankruptcy law purported to terminate the contract automati-

cally upon the filing of the chapter 11 petition or to preclude

its assignment to an entity not a party to the contract. Id. at 

612. 

We rejected the proposed hypothetical test in Leroux, 

holding instead that subsections 365(c) and (e) contemplate a

case-by-case inquiry into whether the nondebtor party (viz., 
 

8See Williams v. Ashland Eng'g Co., 45 F.3d 588, 592 (1st 
Cir.) ("In a multi-panel circuit, newly constituted panels are,
for the most part, bound by prior panel decisions closely on
point."), cert. denied, 116 S. Ct. 51 (1995). 

9Bankruptcy Code 365(e)(2)(A) provides that a statutory or
contractual termination provision, which is contingent upon the
filing of a bankruptcy petition, may be enforceable in bankruptcy
if the "applicable law excuses a party, other than the debtor, to
such contract or lease from accepting performance from or render-
ing performance to the trustee or to an assignee of such contract 
or lease, whether or not such contract or lease prohibits or
restricts assignment of rights or delegation of duties; and (ii)
such party does not consent to such assumption or assignment . .
. ." 11 U.S.C. 365(e)(2)(A) (emphasis added).

10

Pasteur) actually was being "forced to accept performance under 

its executory contract from someone other than the debtor party

with whom it originally contracted." Id. Where the particular 

transaction envisions that the debtor-in-possession would assume

and continue to perform under an executory contract, the bank-

ruptcy court cannot simply presume as a matter of law that the

debtor-in-possession is a legal entity materially distinct from 

the prepetition debtor with whom the nondebtor party (viz., 

Pasteur) contracted. Id. at 613-14 (citing H.R. Rep. No. 1195, 

96th Cong., 2d Sess. 27(b) (1980); NLRB v. Bildisco & 

Bildisco, 465 U.S. 513, 528 (1984)). Rather, "sensitive to the 

rights of the nondebtor party (viz., Pasteur)," the bankruptcy 

court must focus on the performance actually to be rendered by

the debtor-in-possession with a view to ensuring that the

nondebtor party (viz., Pasteur) will receive "the full benefit of 

[its] bargain." Id. at 612-13 (citing S. Rep. No. 989, 95th 

Cong., 2d Sess. 59 (1978), reprinted in 1980 U.S.C.C.A.N. 5787, 

5845). 

Given the pragmatic "actual performance" test adopted

in Leroux, the ultimate findings of fact and conclusions of law 

made by the bankruptcy court10 below did not constitute error.

CBC simply does not occupy the same position as the debtor in

CFLC, Inc., 89 F.3d 673 (9th Cir. 1996), upon which Pasteur 
 

10We are not persuaded by Pasteur's contention that the
failure to cite Leroux in the confirmation order indicates that 
the bankruptcy court failed to follow it. Pasteur itself cited
Leroux at the July 1996 confirmation hearing, and the bankruptcy 
court's ultimate findings faithfully track its model. 

11

relies most heavily. The Plan in CFLC, Inc. unmistakably provid- 

ed for an outright assignment of the debtor's patent license to 

an entirely different corporation with which the patent holder

Cadtrak Corporation had never contracted. Id. at 679-80. By 

contrast, CBC all along has conducted, and proposes to continue,

its retroviral diagnostic enterprise as the same corporate entity

which functioned prepetition, while utilizing Pasteur's HIV2

procedures in that same prepetition endeavor. 

Pasteur nonetheless insists that the reorganized CBC is

different than the prepetition entity, not due merely to its

chapter 11 filing but because it is now owned by a different 

legal entity than before namely, bioMerieux's subsidiary qua 

CBC shareholder. Pasteur's contention finds no support, however,

either in Massachusetts law, see supra note 1, or in the cross- 

license provisions it negotiated. 

Stock sales are not mergers whereby outright title and

ownership of the licensee-corporation's assets (including its

patent licenses) pass to the acquiring corporation. Rather, as a

corporation, CBC "is a legal entity distinct from its sharehold-

ers." Seagram Distillers Co. v. Alcoholic Beverages Control 

Comm'n, 519 N.E.2d 276, 281 (Mass. 1988) (citing 6 William M. 

Fletcher, Cyclopedia of Corporations 2456 (1979 & Supp. 1986)).

Absent compelling grounds for disregarding its corporate form,

therefore, CBC's separate legal identity, and its ownership of

the patent cross-licenses, survive without interruption notwith-

standing repeated and even drastic changes in its ownership. See 

12

id. (holding that corporation's sale of all its capital stock 

does not alter its identity, nor effect a transfer of the

corporation's executory contracts or licenses); see also PPG 

Indus. v. Guardian Indus. Corp., 597 F.2d 1090, 1096 (6th Cir.), 

cert. denied, 444 U.S. 930 (1979) (same; distinguishing mere sale 

of stock from a transfer of patent license as part of corporate

merger wherein merging licensee ends its corporate existence).

Pasteur cites no apposite authority to the contrary.

Furthermore, Pasteur's position finds no support in the

negotiated terms of its cross-licenses. As the patent holder 

and given CBC's corporate form and the governing Massachusetts

law, supra Pasteur was free to negotiate restrictions on CBC's 

continuing rights under the cross-licenses based on changes in

its stock ownership or corporate control. See id. at 1095 

(parties may override law of merger by negotiating express patent

license provision); see also Seagram, 519 N.E.2d at 280-81.11 

Nevertheless, these cross-licenses contain no provision either

limiting or terminating CBC's rights in the event its stock

ownership were to change hands. The generic nonassignability

provisions found in these cross-licenses, see, e.g., Royalty-Free 

Cross-License, at 7.1 ("This Agreement . . . has been made

solely for the benefit of the parties hereto" and "no other

person shall acquire or have any right under or by virtue of this
 

11Notwithstanding Pasteur's reliance on the important policy
goals animating the federal common law of patents, the product-
innovation theme promoted under patent law may well be accommo-
dated by allowing patent holders to control sublicensing through 
negotiated contract restrictions.  

13

Agreement."), plainly do not address the circumstance presented

here. Rather, these nonassignability provisions simply beg the

essential question, which is whether bioMerieux's subsidiary, by

virtue of its acquisition of CBC stock, terminated CBC's rights 

under the cross-licenses. Interpreted as Pasteur proposes, CBC's

own rights under the cross-licenses would terminate with any 

change in the identity of any CBC stockholder. 

Other cross-license provisions directly undercut

Pasteur's interpretation as well. See Willitts v. Roman Catholic 

Archbishop of Boston, 581 N.E.2d 475, 478 (Mass. 1991) (noting 

that a contract must be interpreted as a whole). These cross-

licenses explicitly authorize CBC to share its license rights

with any "affiliated company," which on its face presumably

encompasses a parent corporation such as bioMerieux's subsidiary.

Cross-Licenses, at 1.4 (defining "Affiliated Company" as "an

organization which controls . . . a party or an organization

which is under common control with a party"); see supra Section 

I. Yet more importantly, CBC insisted upon a provision which

would afford it the unilateral right to terminate any sublicense

Pasteur might extend to a company called Genetic Systems "if

control of Genetic Systems shall . . . be acquired, directly or

indirectly, by any person or group of connected persons or

company not having such control at the date hereof, by recon-

struction, amalgamation, acquisition of shares or assets or 

otherwise." Royalty-Free Cross-license, at 2.3 (emphasis 

added); see PPG Indus., 597 F.2d at 1096 (noting that patent 

14

holder's express reservation of change-of-stock-ownership condi-

tion in two patent licenses suggested its intention not to

reserve condition in nine other patent licenses); see also 

Plumbers & Steamfitters Local 150 v. Vertex Constr. Co., 932 F.2d 

1443, 1449 (11th Cir. 1991) ("[T]he doctrine of expressio unius 

est exclusio alterius instructs that when certain matters are 

mentioned in a contract, other similar matters not mentioned were

intended to be excluded."). Taken together, these provisions

persuade us that Pasteur foresaw, or reasonably should have

foreseen, that CBC might undergo changes of stock ownership which

would not alter its corporate legal identity, but nonetheless

chose not to condition the continued viability of its cross-

licenses accordingly.12 
 

12Lastly, Pasteur misplaces reliance upon In re Alltech 
Plastics, Inc., 5 U.S.P.Q.2d 1806 (Bankr. W.D. Tenn. 1987), where 
it was held that section 365(c) precluded an entity, which had
acquired the corporate debtor's stock pursuant to a chapter 11
reorganization plan, from exercising the debtor's rights under a
prepetition patent license. Following the conversion of its
original chapter 11 reorganization case to a chapter 7 liquida-
tion, Alltech discontinued all operations and discharged its
employees. Before the debtor once again converted to chapter 11,
its trustee liquidated virtually all its assets, except for its
patent license. Noting that plan confirmation is a fact-inten-
sive, equity-based inquiry, id. at 1813, the bankruptcy court 
characterized the sale of Alltech's stock to Fluoropak Container
Corporation as a de facto assignment of the patent license to a 
noncontracting party. It so held because unlike CBC, Alltech had 
ceased to exist except as a "shell." Id. at 1807 & 1810 (noting 
that "shell" emerging after Alltech's chapter 7 conversion "is in
reality a different entity than the prepetition Debtor"). The
bankruptcy court specifically observed that the "attempted
innovative rebirth of a corporate shell is not analogous to a
sale of stock by an active corporation," id. at 1810-11, and that 
"the present case is distinguished from one where the reorganiz-
ing debtor, operating continuously and in good standing with its
licensor, seeks to approve the sale of its stock [to a third
party]," id. at 1812. The bankruptcy court further noted that 

15

III III

CONCLUSION CONCLUSION 

As CBC remains in all material respects the legal

entity with which Pasteur freely contracted, Pasteur has not made

the required individualized showing that it is or will be de-

prived of "the full benefit of [its] bargain," Leroux, 69 F.3d at 

612-13, under the ruling challenged on appeal. Accordingly, the 

district court judgment is affirmed and costs are awarded to 

appellee. 

So ordered. So ordered. 

 

the lack of demonstrated expertise on the part of Fluoropak, in
utilizing the patented process to manufacture toxic-material
containers, likewise posed a serious public safety risk. Id. 
These distinguishing circumstances make Alltech inapposite. 

16