United States Court of Appeals
Fifth Circuit

**F I L E D**

**February 13, 2006**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 04-11264

IN THE MATTER OF: MIRANT CORPORATION,

Debtor,

BONNEVILLE POWER ADMINISTRATION,

Appellant,

VERSUS

MIRANT CORPORATION,

Appellee.

Appeal from the United States District Court
For the Northern District of Texas

Before GARWOOD, SMITH, and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

Bonneville Power Administration ("BPA") appeals the district court's affirmance of two orders entered by the bankruptcy court. Debtor Mirant Corporation and related entities filed a petition under Chapter 11 of the Bankruptcy Code, triggering a dispute between the parties regarding the ability of BPA to terminate an executory contract for the future purchase of electric power. On the one hand, the Bankruptcy Code's automatic stay, effective upon

the filing of a Chapter 11 petition, precludes any act to obtain possession of or exercise control over property of the estate. *See* 11 U.S.C. § 362(a). On the other hand, in an executory contract related to the future call of energy purchase by BPA, *see generally* § 365, the parties agreed to an ipso facto clause that provided for default and a termination payment in the event of a bankruptcy filing, *see* § 365(e).[1] BPA argues that the Bankruptcy Code (or the "Code") permits it to terminate the executory contract pursuant to the contract's ipso facto clause. *See* § 365(e)(2)(A). The parties now dispute the priority of the two Chapter 11 provisions: the automatic stay and the termination arguably permitted by the combined effect of the ipso facto clause and § 365(e)(2)(A).

This appeal requires us to address the intersection of three relevant statutory provisions: 11 U.S.C. § 362(a) (the automatic bankruptcy stay); 11 U.S.C. § 365(e)(2)(A) (permitting a nondebtor party to an executory contract to terminate or modify such contract when applicable law excuses the nondebtor from accepting or rendering performance to the trustee or an assignee); and the Anti-Assignment Act (or "the Act"), 41 U.S.C. § 15 (prohibiting transfer of contracts to which the United States is a party).

Concluding that the bankruptcy stay precedes any termination permitted by either the Anti-Assignment Act or the agreement of the

---

[1]*See* BLACK'S LAW DICTIONARY 847 (8th ed. 2004) (defining *ipso facto* clause as a "contract clause that specifies the consequences of a party's bankruptcy").

2

parties, we affirm the district court's order declaring BPA to have violated the automatic stay. Finding no abuse of discretion in the court's determination that cause was not shown where the Anti-Assignment Act is not an applicable law under § 365(e)(2)(A), we affirm also the denial of BPA's motion to lift or modify the stay.

## I. Background

### A. Factual Background

Mirant Corporation is an international energy company that produces and sells electricity in the United States and abroad. Appellee Mirant Americas Energy Marketing, L.P. ("Mirant") is a subsidiary of Mirant Corporation and engages in asset risk management, including commodities, energy, and financial product trading. Mirant is responsible for procuring fuel and selling power for Mirant Corporation's operating facilities.

BPA is a federal power marketing agency within the United States Department of Energy. BPA was created in 1937 by Congress to market low-cost hydroelectric power generated by a series of federal dams along the Columbia River in the Pacific Northwest. *See generally* Bonneville Project Act of 1937, 16 U.S.C. § 832. Originally, BPA marketed the energy produced for the benefit of the public, particularly domestic and rural customers, giving preference and priority to public bodies and cooperatives. *See* § 832c(a). For some time, surplus in energy production meant BPA could market freely to all who desired to purchase in the area. In

3

1980, increasing demands upon the supply triggered, in part, Congress's enactment of the Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C. §§ 839-839h, which required BPA to offer new contracts to its customers. *See Aluminum Co. of Am. v. Cent. Lincoln People's Util. Dist.*, 467 U.S. 380, 382 (1984). Thereafter, BPA was authorized to acquire additional resources in order to increase the supply of federal power. *See* 16 U.S.C. § 839d(a)(2). Accordingly, BPA entered certain contracts related to the marketing of federal power. *See* § 832a(f).

BPA and Mirant are parties to the Western Systems Power Pool Agreement (the "WSPPA"), a contract the parties agree is standard for electric power sales. The WSPPA is an umbrella agreement governing electric power transactions. Subject to the WSPPA, BPA and Mirant's predecessor in interest (Southern Company Energy Marketing, L.P.[2]) entered two agreements: (1) the Agreement to Enable Future Purchases, Sales, and Exchanges of Power and Other Services No. 99PB-10588 (the "Enabling Agreement") and (2) an option contract though which BPA purchased a one-time call option for the future purchase of a set amount of firm power from Mirant over a three-year period commencing in 2004 (the "Confirmation Agreement").

Together, the WSPPA, the Enabling Agreement, and the

---

[2]Mirant Corporation was originally a wholly owned subsidiary of Southern Company Energy Marketing.

Confirmation Agreement (collectively, the "Agreement") form the sum of the parties' contractual rights and obligations.[3] Under the terms of the Agreement, BPA owed no obligation to exercise its option, and if it did not do so, the option expired on the strike date provided, December 23, 2003. The parties agree, and the lower courts noted, that BPA did not exercise and, in practical terms, would not have exercised its option because the option price bargained for in the Agreement exceeded the market price of energy during the relevant period of the Agreement.

The Agreement includes a default provision, or ipso facto clause, that authorizes BPA to terminate the contract and claim liquidated damages if Mirant petitioned for bankruptcy before the option period expired. The Agreement provides that default by the institution of a bankruptcy proceeding triggers the non-defaulting party's "right to terminate all transactions between the Parties under this Agreement upon written notice" and the non-defaulting party's right to a termination payment. Upon termination, the non-defaulting party may liquidate all transactions with the debtor and demand a termination payment equal to the market-based cost of

---

[3]Although the parties below disputed the integration of the contracts, some of which were executory in nature and others of which were not, the bankruptcy court assumed without deciding that the Confirmation Agreement was an executory contract and that the three contracts formed a single agreement. In their briefings to this Court, both parties treat the three contracts as an integrated agreement.

5

replacing the option contract.[4]  The Agreement also provides that all transactions under the agreement are forward contracts and that the parties are forward contract merchants as defined by the Bankruptcy Code.  *See* 11 U.S.C. § 556.

On July 1, 2003, BPA wrote to Mirant requesting, pursuant to the Agreement, adequate assurances of Mirant's ability to perform.  Mirant responded by letter on July 3, stating its willingness to wire assurance but disputing the reasonable estimate of the amount of assurance.  On July 7, Mirant wired to BPA $523,389 as adequate assurance of its ability to perform.

B.  **Procedural Background**

On July 14, 2003, Mirant Corporation and 82 of its direct and indirect subsidiaries, including Mirant, filed voluntary Chapter 11 bankruptcy petitions.  That day, the court held a hearing and entered an interim order authorizing the Debtors to comply with the terms of prepetition trading contracts and to enter into postpetition trading contracts in the normal course of business and setting a final hearing for the entry of a final order of authorization.  The bankruptcy court also approved the joint

---

[4]As a practical matter, the bankruptcy court noted that the peculiar facts of this case mean the primary dispute between the parties is the termination payment.  Because market prices were lower than the option price of the Agreement during the relevant period, both parties acknowledged that the Agreement would never have been performed.  According to the bankruptcy court, BPA seeks to declare Mirant's default and thereby obtain a claim against Mirant in bankruptcy proceedings for the amount of the termination payment.

administration of the Debtors' cases.[5]

Under the Code, Mirant as a debtor remains in possession of its estate. *See* 11 U.S.C. § 1101.[6] Mirant continues to conduct its business in the ordinary course. On July 16, 2003, the bankruptcy court ordered the parties, specifically including all governmental units, to comply with the Code's automatic stay provision, § 362, and its provision regarding executory contracts and unexpired leases, § 365 (the "Order to Comply").[7] The Order to Comply enjoined BPA from multiple acts affecting Mirant or the debtor estate, including interference in any way with any and all of the property of any of the Debtors. The Order to Comply expressed that it had no effect upon any exceptions to the automatic stay, based upon any section of the Bankruptcy Code, or upon the right of any party to seek relief from the automatic stay according to § 362(d).

---

[5]The United States Trustee for the Northern District of Texas appointed three official committees in the jointly administered cases.

[6]A debtor in possession "means debtor except when a person that has qualified under section 322 of this title is serving as trustee in the case." 11 U.S.C. § 1101.

[7]Section 362 provides for automatic stay of, among other actions, "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate," 11 U.S.C. § 362(a)(3), and provides exceptions to the automatic entry of stay, § 362(b).

Section 365 provides for the administration of contracts, such as the one at issue here, including the debtor's assumption or rejection of such a contract. 11 U.S.C. § 365(a).

BPA terminated its Confirmation Agreement with Mirant shortly thereafter, and Mirant characterizes this termination as a violation of the bankruptcy court's order and stay. On July 30, 2003, BPA notified Mirant in writing that the Chapter 11 petition constituted default under the parties' Agreement and that accordingly, BPA terminated all transactions with Mirant. BPA stated that under the terms of the Agreement, both parties were forward contract merchants and that the Agreement was a forward contract for purposes of 11 U.S.C. § 556. BPA also demanded a termination payment from Mirant under the Agreement of $1,085,040[8] and set forth terms for the payment of that amount in light of the assurance Mirant had already provided and the amount BPA yet owed Mirant under the Agreement. BPA requested payment of the remaining amount allegedly owed by Mirant, $533,026, within three days of receipt of the July 30 letter.[9]

In response to BPA's termination letter and termination payment demand, Mirant wrote to BPA on August 7, 2003, challenging BPA's status as a forward contract merchant under the Code, describing BPA's purported termination of the Agreement as a violation of §§ 362 and 365 of Chapter 11, and demanding that BPA

---

[8]BPA calculated the termination payment based upon market quotes for replacement transactions on July 30, 2003.

[9]By its own description, the July 30 letter constituted a contracting officer's final decision under 41 U.S.C. § 605, permitting Mirant to appeal the decision to either the Department of Energy Contract Board of Appeals or the United States Court of Federal Claims.

immediately withdraw its purported termination of the Agreement and perform. BPA later responded by letter, notifying Mirant of BPA's refusal to withdraw the termination letter.

On August 27, 2003, the bankruptcy court entered its final authorization order to Debtors, permitting compliance with prepetition trading contracts and entrance into post-petition trading contracts in the ordinary course of business, providing credit support for trading contracts, and authorizing assumption of prepetition trading contracts. This final authorization order contemplated the possible future event of a creditor, such as BPA, demanding acceptance or rejection of a trading option contract.

Before the bankruptcy court, on October 17, 2003, Mirant filed a motion to enforce the automatic stay and for contempt, arguing (1) that the transmission of BPA's July 30 termination letter violated the automatic stay, 11 U.S.C. § 362(a), because the act constituted an attempt to obtain possession of property of the estate and to exercise control over the estate; and (2) that BPA, as an entity of a government agency, cannot be a forward contract merchant under the Code's definition (the "Motion to Enforce"). BPA responded that under the Code, it was a forward contract merchant and that the Anti-Assignment Act, 41 U.S.C. § 15, bars any assignment of the Agreement, thus permitting BPA's termination of the Agreement consistent with 11 U.S.C. § 365(e)(2)(A). The

9

bankruptcy court heard argument on November 12, 2003,[10] ruled that BPA had violated the stay, and offered BPA an option either to rescind its termination or to return for a continued hearing on the motion for contempt related to that violation.[11]

On November 17, 2003, the court entered an order, to which the parties had agreed in the interim, declaring that BPA had violated the automatic stay, denying the relief sought by BPA, ordering BPA to rescind its termination of the Confirmation Agreement, and returning the parties to the status quo that existed immediately prior to the delivery of the Termination Letter (the "Stay Violation Order").[12]  BPA appealed the Stay Violation Order to the

---

[10]During the hearing, BPA represented that the only basis for Mirant's default under the Agreement was the filing of a bankruptcy petition.

[11]The bankruptcy court also ruled BPA was not a forward contract merchant.  A forward contract merchant must be a person under the plain text of the Code.  11 U.S.C. § 101(26).  The bankruptcy court reasoned that because a governmental entity is not a person under the code, *see* §§ 101(26), 101(41), BPA could not be a forward contract merchant.  As such, the court concluded, BPA is not authorized by the Code to enjoy the exceptions to automatic stay provided to forward contract merchants under §§ 362(b)(6) and 556.  BPA waived its challenge to the bankruptcy court's interpretation of "forward contract merchant" on appeal to this Court.

[12]BPA subsequently wrote to counsel for Mirant, withdrawing its Termination Letter and reinstating the Confirmation Agreement.  BPA noticed its retention of rights under the Agreement and applicable law and expressed that its compliance with the Stay Violation Order did not constitute waiver of those rights.  The issue of waiver — whether BPA waived its challenge to the Stay Violation Order by agreeing to withdraw its termination — was presented to the district court, which concluded that BPA did not waive its challenge to the Stay Violation Order because the bankruptcy court had already ruled

10

district court.  During this period, other creditors, aside from BPA, filed motions for modification of the stay and motions to require Mirant's assumption and assignment or rejection of various trading contracts, and they received bankruptcy court rulings on those motions.

On December 5, 2003, BPA filed a motion to modify the automatic stay retroactively to permit termination of the Confirmation Agreement (the "Motion to Modify Stay").  At that time, the option of the Confirmation Agreement was soon to expire on December 23.  The bankruptcy court held a December 17 hearing on the motion and responses, and the court subsequently denied the Motion to Modify Stay.  In its memorandum opinion, the bankruptcy court cited the Ninth Circuit in holding that (1) the stay applies to prevent unilateral termination even if a contract is unassumable and contains a valid ipso facto clause and (2) the stay must be modified before the ipso facto clause may be invoked.  *See Computer Commc'ns, Inc. v. Codex Corp.* (*In re Computer Commc'ns*), 824 F.2d 725, 729-30 (9th Cir. 1987); 3 COLLIER ON BANKRUPTCY ¶ 365.06[1][f] (15th ed. rev. 2005).  The bankruptcy court clarified that its refusal to modify the stay stemmed from BPA's failure to make a sufficient showing of cause as required by § 362(d)(1).  BPA could

_____

that BPA violated the stay when the court presented BPA the option of either rescission of the termination letter or continuation on the motion for contempt.  Mirant does not argue BPA waived its ability to challenge the Stay Violation Order on appeal to this Court.

11

not, according to the court's holding, show cause in the absence of Mirant's default and even if the ipso facto clause could be enforced to trigger default, BPA failed to demonstrate cause for relief where BPA would suffer no harm by the continued enforcement of the stay.

BPA appealed the order denying the Motion to Modify Stay, and the district court consolidated BPA's appeals of the two bankruptcy court orders. The district court affirmed the bankruptcy court's Stay Violation Order and denial of BPA's Motion to Modify Stay on August 13, 2004. BPA timely appealed to this Court.

## II. Discussion

### A. Standard of Review

We review questions of law, including the interpretation of statutory language, *de novo*. *See*, *e.g.*, *Fed. Trade Comm'n v. Nat'l Bus. Consultants, Inc.*, 376 F.3d 317, 319 (5th Cir. 2004); *United States v. Bridges*, 894 F.2d 108, 111 (5th Cir. 1990). Our review of a bankruptcy court's findings of fact is for clear error. *Zer-Ilan v. Frankford (In re CPDC, Inc.)*, 337 F.3d 436, 440-41 (5th Cir. 2003). "This Court may affirm if there are any grounds in the record to support the judgment, even if those grounds were not relied upon by the courts below." *Bustamante v. Cueva (In re Cueva)*, 371 F.3d 232, 236 (5th Cir. 2004) (internal quotation marks omitted).

The bankruptcy court's denial of a motion for modification of

12

a stay is reviewed for abuse of discretion. *See*, *e.g.*, *Chunn v. Chunn (In re Chunn)*, 106 F.3d 1239, 1242 (5th Cir. 1997).

## B.    The Parties' Arguments

The parties agree that the Confirmation Agreement here is an executory contract under the Bankruptcy Code and that therefore the Code's provision for executory contracts applies. *See* 11 U.S.C. § 365.[13]  Generally, § 365(e) of the Code bars the enforcement of ipso facto clauses in executory contracts, such as the ipso facto clause in the Agreement here. § 365(e)(1).[14]  However, an exception to this general rule appears in subsection (e)(2)(A),

> (2)    Paragraph (1) of this subsection does *not* apply to
> an executory contract . . . , if –

---

[13]"[T]he legislative history of § 365(a) indicates that Congress intended the term [executory contract] to mean a contract 'on which performance remains due to some extent on both sides.'" *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522 n.6 (1984)(quoting H.R. Rep. No. 95-595, at 347 (1977)), *superseded by statute on other grounds*, 11 U.S.C. § 1113 (1984).  We accept the parties' characterization of the Agreement and assume, without addressing the issue, that the Agreement is an executory contract under Chapter 11.

[14]Section 365(e)(1) provides the general rule,

(1) Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract that is conditioned on –
. . .
(B) the commencement of a case under this title . . . .

§ 365(e)(1).

13

(A)(i) applicable law excuses a party, other than the debtor, to such contract or lease *from accepting performance from or rendering performance to the trustee or to an assignee* of such contract or lease, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and
(ii) such party does not consent to such assumption or assignment . . . .

§ 365(e)(2)(A) (emphasis added).

BPA argues that the subsection (e)(2)(A) exception applies to this case, permitting the Agreement's ipso facto clause to have effect, terminating the Agreement as of Mirant's Chapter 11 filing, and precluding any review by the bankruptcy court. According to BPA, the exception applies because the Anti-Assignment Act is an "applicable law" under the text of § 365(e)(2)(A) that excuses BPA "from accepting performance from or rendering performance to the trustee or to an assignee" of the Agreement. § 365(e)(2)(A).

The Anti-Assignment Act provides,

No contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States is concerned.

41 U.S.C. § 15(a).

BPA explains the Act's application to this Agreement as follows. BPA argues that § 365(e)(2)(A) carves out a class of executory contracts whose ipso facto clauses may be given effect when nonbankruptcy, applicable law renders the contract unassignable (in the abstract as opposed to upon a factual showing) to "the trustee or an assignee" without consent of the nondebtor

14

party.  This Agreement is such an executory contract, according to BPA, because the Anti-Assignment Act excuses the United States from accepting performance from an assignee. In this vein, BPA asks this Court to join other circuits that have held that § 365(e)(2)(A) creates a hypothetical test, under which a debtor is precluded from assuming or assigning an executory contract even if the applicable law would not bar assignment in the actual circumstances before the court but does bar assignment to a hypothetical third party, "*i.e.,* under the applicable law, could the government refuse performance from [an assignee]."  *See In re West Elecs., Inc.*, 852 F.2d 79, 83 (3d Cir. 1988);  *see also Perlman v. Catapult Entm't, Inc.* (*In re Catapult Entm't, Inc.*), 165 F.3d 747, 750 (9th Cir. 1999).[15]

BPA asks this Court to hold that under a hypothetical test, § 365(e)(2) permits automatic termination of the Agreement prior to

---

[15]BPA secondarily argues that if the Act must be applied to the facts, rather than in the abstract, then the assignment here occurs as a result of Mirant's change in status from prepetition entity to debtor in possession.  But before the bankruptcy court, BPA conceded there was no assignment on this record from Mirant prepetition to Mirant as debtor in possession.  BPA argued instead that subsection (e)(2)(A)'s text contemplates a hypothetical, rather than actual, test of assignment.

    THE COURT: "[A] debtor is not an assignee when property passes to an estate, not for tax purposes, not for anything.  In fact, there is no assignee here?  Who's the assignee?"

    COUNSEL FOR BPA: "Your Honor, there isn't one.  But that's what (a)(2) contemplates.  It's a hypothetical test."

15

judicial review and prior to the entry of automatic stay, or in the alternative, that § 365(e)(2) requires a bankruptcy court to lift the automatic stay in order for the ipso facto clause to be enforced. Accordingly, BPA challenges both the bankruptcy court's entry of automatic stay and denial of a modification to the stay because the ipso facto clause and the Anti-Assignment Act permit BPA to terminate the Agreement automatically upon Mirant's Chapter 11 filing prior to any review by or approval of the bankruptcy court under § 365(e)(2)(A).

Mirant responds that the automatic stay provision, § 362(a), is violated by BPA's termination of the Agreement, that is, BPA's attempt to exercise control of property of the estate without the oversight of the bankruptcy court. Mirant argues the bankruptcy court did not abuse its discretion in entering the stay because the stay is automatic and either the Anti-Assignment Act does not apply because there was no transfer or, even if the Act does apply, the stay's automatic entry precedes any termination permitted by the combined effect of the Act, § 365(e)(2)(A), and the ipso facto clause of the Agreement. Mirant also argues the bankruptcy court did not err in denying BPA's motion to modify the stay because BPA failed to show the cause required under § 362(d)(1). In support, Mirant urges this Court to adopt an actual, or as-applied, analysis to determine whether the Anti-Assignment Act applies to this case and to conclude that it does not (thereby foreclosing termination via the ipso facto clause) because no assignment occurred here.

16

## C. Analysis

### 1. Hypothetical vs. Actual Test

We begin by addressing the question that affects each of the issues raised by BPA, that is, whether this Circuit adopts the actual or hypothetical approach to the text of § 365(e)(2)(A). The hypothetical test was first announced and adopted in the sole circuit opinion to address the conjunctive effect of § 365 and the Anti-Assignment Act. *West*, 852 F.2d at 82. In *West*, a divided panel addressed similar facts and held the bankruptcy court abused its discretion in denying a lift of the Chapter 11 stay, which had the effect of preventing the government from terminating an executory contract under the two statutes. 852 F.2d at 82. Addressing § 365(c),[16] as opposed to § 365(e)(2) at issue here, the *West* majority created a hypothetical test for the determination of whether the Anti-Assignment Act was an "applicable law" such that the government could refuse performance under the Act. The *West* majority rejected an as-applied determination of whether assignment

---

[16]Section 365(c) precludes a trustee from assuming or assigning an executory contract if "(1)(A) applicable law excuses a [nondebtor] party . . . to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession . . . and (B) such party does not consent to such assumption or assignment." 11 U.S.C. § 365(c)(1). Although the language of subsections (c)(1) and (e)(2) of § 365 are similar, they are by no means parallel overall or identical in effect. The two are not sufficiently similar that caselaw interpreting the one should be given any more than informative weight in interpreting the other.

17

had occurred under the Act.  *Id*.  Concluding that hypothetically speaking the Anti-Assignment Act was an "applicable law" because it made the contract generally unassignable, the majority in *West* held that § 365(c)(1) foreclosed the debtor's ability to assume the contract.  *Id*. at 83.  The majority reasoned:

> We think that by including the words "or the debtor in possession" in 11 U.S.C. § 365(c)(1) Congress anticipated an argument like the one here made and wanted that section to reflect its judgment that in the context of the assumption and assignment of executory contracts, a solvent contractor and an insolvent debtor in possession going through bankruptcy are materially distinct entities.  While the relevant case law is very sparse, it supports our understanding of the interplay between . . . § 365(c)(1) and 41 U.S.C. § 15.

*Id*. (footnote omitted).

In other words, under the Third Circuit's hypothetical approach, which rested on language in § 365(c)(1) that does not appear in § 365(e)(2)(A), a court must ask whether BPA could refuse to accept performance of the Agreement from *any* assignee because the Anti-Assignment Act makes the Agreement unassignable as a matter of law.  If so, then irrelevant is the fact that the debtor did not actually assign, intend to assign, or attempt to assign the contract, and consequently the executory contract is terminable by its ipso facto provision under § 365(c).  *See id.; see also RCI Tech. Corp. v. Sunterra Corp. (In re Sunterra Corp.)*, 361 F.3d 257 (4th Cir. 2004) (addressing § 365(c) and copyright law); *Catapult*, 165 F.3d at 747 (addressing § 365(c) and federal patent law); *City*

18

*of Jamestown v. James Cable Partners, L.P.* (*In re James Cable Partners*, *L.P.)*, 27 F.3d 534, 537 (11th Cir. 1994) (addressing § 365(c) and a municipal ordinance regarding franchise rights).

In contrast, the *West* dissent believed that Congress did not intend for "a 'solvent contractor and an insolvent debtor in possession going through bankruptcy' [to be] different entities for the purposes of the [Anti-Assignment Act]." *West*, 852 F.2d at 84 (Higginbotham, J., dissenting in part) (citation omitted). Likewise, those courts that have rejected *West*'s hypothetical analysis adopt an actual test to determine a law's applicability under § 365. *See Summit Inv. & Dev. Corp. v. Leroux*, 69 F.3d 608, 613 (1st Cir. 1995); *see also Cajun Elec. Members Comm. v. Mabey* (*In re Cajun Elec. Power Coop., Inc.*), 230 B.R. 693, 705 (Bankr. M.D. La. 1999); *In re Lil' Things*, *Inc.*, 220 B.R. 583, 587 (Bankr. N.D. Tex. 1998); *Texaco Inc. v. La. Land & Exploration Co.*, 136 B.R. 658, 669 (Bankr. M.D. La. 1992) (concluding the *West* hypothetical test is incorrect for three primary reasons); *In re Hartec Enters., Inc.*, 117 B.R. 865, 871 (Bankr. W.D. Tex. 1990) (stating that the *West* hypothetical test "does not fulfill the purposes of the non-assignment statutes it seeks to enforce, creates inherent inconsistencies in the language of . . . the Code, and fails to adequately account for" amendments to the Code), *vacated by settlement*, 130 B.R. 929 (W.D. Tex. 1991).

The actual or as-applied determination of whether a law is

19

"applicable" under § 365(c) and (e)(2)(A) was first adopted by the First Circuit. *Summit Inv.*, 69 F.3d at 613. The actual test requires on a case-by-case basis a showing that the nondebtor party's contract will actually be assigned or that the nondebtor party will in fact be asked to accept performance from or render performance to a party — including the trustee — other than the party with whom it originally contracted. *Id*. at 612. The actual test contemplates that in a case where no assignment has taken place, § 365(e)(2)(A)'s exception is not available and, as such, an ipso facto clause is invalidated. *See id.; see also Institut Pasteur v. Cambridge Biotech Corp.*, 104 F.3d 489, 493 (1st Cir. 1997), *abrogated on other grounds by Hardemon v. City of Boston*, 144 F.3d 24 (1st Cir. 1998); *In re Cardinal Indus. Inc.*, 116 B.R. 964, 982 (Bankr. S.D. Ohio 1990).

Although this Circuit has addressed § 365(c)(1), we have yet to address § 365(e) or to name the test we apply to the determination of whether a nonbankruptcy law applies under either § 365(c)(1) or § 365(e)(2)(A). *See Stumpf v. McGee* (*In re O'Connor*), 258 F.3d 392, 402 (5th Cir. 2001); *Pension Benefit Guar. Corp. v. Braniff Airways, Inc.* (*In re Braniff Airways, Inc.*), 700 F.2d 935, 943 (5th Cir. 1983). Review of this Circuit's law, however, reveals that our adoption today of the actual test, in resolving the availability of § 365(e)(2)(A)'s exception, is consistent with prior caselaw. In *O'Connor*, a panel of this Court

20

determined that a Louisiana statute regarding partnership was an applicable law under § 365(c) and engaged in an as-applied analysis to determine whether an exception to the general rule applied to the case at hand to permit the assumption of the executory contract. 258 F.3d at 403-04 (concluding that the exception was not applicable and declaring the contract unassumable). In *Braniff*, a nondebtor objected to the district court's order that authorized the debtor in possession to assign its lease agreements with the United States for use of space at Washington National Airport to a different airline under the version of § 365 (c) that existed prior to the 1984 amendment. 700 F.2d at 942. Reversing the district court and prohibiting the assignment of the lease, the panel concluded that the broad language of § 365(c) was not limited in application solely to personal service contracts. *Id*. at 943. The *Braniff* court held that the Code of the District of Columbia and a federal regulation enacted pursuant to that Code were "applicable law" under § 365(c), which prevented the lease's assignment because, in fact, the assignment had been attempted and ordered by the district court and the assignee airline had not been approved to perform by the agency vested with the authority for such approval. *Id*. at 942-43. *Braniff* did not address the hypothetical approach; indeed, the split between actual and hypothetical approaches had not yet emerged nor had any court yet approved a hypothetical approach to the determination of whether a

21

law is applicable.  Instead, *Braniff* addressed the language of §
365(c) prior to its amendment in 1984.  However, the pre-amendment
language of § 365(c) more closely tracks the current language of §
365(e)(2)(A) than it does the current form of § 365(c).[17]  Thus, the
approach taken in *Braniff* informs our approach to § 365(e)(2)(A) on
this record, even in light of the statutory amendment to § 365(c)
and the post-amendment development of a split between the
hypothetical and actual tests.

The plain text of § 365(e)(2)(A) requires an actual test for
determining whether a law is "applicable" under the exception,
permitting enforcement of an ipso facto clause.  According to the
statute's plain language, an executory contract's ipso facto clause
may be enforced if "applicable law excuses a [nondebtor] party . .
. from accepting performance from or rendering performance . . . to
an assignee of such contract" and that non-debtor party does not
consent to "such assumption or assignment."   11 U.S.C. §

---

[17]"Before the 1984 amendment, the pivotal language in
section  § 365(c) read precisely like the current version of
section 365(e)(2); that is, it adverted to the 'applicable law
excus[ing] a party, other than the debtor, to such contract or
lease from accepting performance from or rendering performance *to
the trustee or to an assignee* of such contract or lease . . . .'"
*Summit Inv*., 69 F.3d at 613 (alteration in original).  In 1984,
Congress made no change to the statute we address today, §
365(e)(2)(A), and with respect to § 365(c), it replaced the
phrase "to the trustee or to an assignee of such contract or
lease" that still appears in § 365(e)(2)(A) with the phrase "to
an entity other than the debtor or debtor in possession."  *See*
Leasehold Management Bankruptcy Amendments Act of 1983, Pub. L.
No. 98-353, § 362, 98 Stat. 333, 361 (July 10, 1984); *see also*
*Summit Inv*., 69 F.3d at 613.

22

365(e)(2)(A). Congress might have chosen the exception to apply if any law prohibited the assignment, but instead Congress tethered the exception to "applicable" law that "excuses a party." It is axiomatic that an applicable law must apply to a set of circumstances; BPA creates smoke and erects mirrors when it argues that a contract not assignable as a matter of law, even if no such assignment existed in fact and no excuse existed in fact for the nondebtor party to refuse acceptance or performance in a particular situation, satisfies the language chosen by Congress in drafting the § 365(e)(2)(A) exception. The law that releases a nondebtor from the general rule foreclosing the enforcement of an ipso facto clause must apply to something and must excuse the nondebtor from some specific performance or acceptance, *see* § 365(e)(2)(A); thus, if the debtor demonstrates that no application exists or that no excuse obtains on a given record, then the congressional language announces such a circumstance is material, making the § 365(e)(2)(A) exception unavailable. The applicability of the law under § 365(e)(2)(A) is determined not in the abstract but on the record at hand. *See Cajun Elec.*, 230 B.R. at 705; *Lil' Things*, 220 B.R. at 587; *Texaco*, 136 B.R. at 669; *Cardinal Indus.*, 116 B.R. at 974-75.

That applicability is determined based upon the case is supported also by the congressional choice to structure the exception as a two-part test, the second portion of which requires

23

a fact-based showing. *See* 11 U.S.C. § 365(e)(2)(A)(i)-(ii). Subsection (ii) provides that the § 365(e)(2)(A) exception lies only where "such [nondebtor] party does not consent to such assumption or assignment." *§* 365(e)(2)(A)(ii). The combination of the plain text and the overall structure of the test that must be met in order for the exception to arise communicates that Congress intended § 365(e)(2)(A) to apply to a given factual situation rather than to a class of executory contracts as BPA urges.

BPA argues that the use of the adjective "such" merely refers to the assumption and assignment provided in the preceding subsection and does not demand that Congress intended an actual test would determine the exception's availability. We are not persuaded that standing alone, Congress's use of the adjective "such" to modify "assignment" in § 365(e)(2)(A)(ii) mandates the use of an actual test. The modifier "such" references the assignments provided in the preceding subsection and does not, on its own, require an as-applied approach to the determination of whether a law applies to permit an ipso facto clause's enforcement. However, in combination with the other factors that demand a case-by-case inquiry into whether a nonbankruptcy law applies to permit termination by ipso facto clause, we cannot agree with so broad an analysis as permitted by the entirely theoretical approach countenanced by those courts adopting the hypothetical approach.

Finally, the plain text of the law proffered by BPA as

24

applicable here, the Anti-Assignment Act, cuts against the broad application advanced by BPA. In theory, a law of such general applicability might exist to merit application in most if not all circumstances under § 365(e)(2)(A), but the Anti-Assignment Act is, by its own terms, not so broadly applicable. Subsection (a) of the Act provides a general rule for annulment of a public contract upon a transfer by a party other than the United States. 41 U.S.C. § 15(a). Subsection (b), though, limits the application of the general rule, and the limitation applies on the basis of specific facts. "The provisions of subsection (a) of this section *shall not apply* in any *case in which* the moneys due or to become due from the United States . . . under a contract providing for payments aggregating $1,000 or more, are assigned to a bank, trust company, or other financing institution" given other fact-based circumstances. § 15(b) (emphasis added). Both the text of the Anti-Assignment Act and the text of § 365(e)(2)(A) require a case-by-case inquiry into the application of the Act to the executory contract or lease at issue in the bankruptcy proceeding. As such, we hold that with respect to § 365(e)(2)(A) and the Anti-Assignment Act, the actual test must be used to determine the Act's applicability to a given case.[18] When the law to be applied to a

---

[18]Although we join the First Circuit in requiring an actual test to determine whether a law applies under § 365(e)(2)(A), we do not entirely join its reasoning. *See Summit Inv.*, F.3d at 612-14. Interpreting § 365(e)(2)(A), the First Circuit found that the statute's plain text permitted both the actual and

§ 365(e)(2)(A) determination cannot apply to the case and the record before the bankruptcy court in fact or law, then § 365(e)(2)(A)'s exception cannot give effect to an ipso facto clause.

## 2.  Automatic Stay

Given that the actual test applies based upon the plain language of § 365(e)(2)(A), we next conclude that the automatic stay must precede any enforcement of an ipso facto clause ultimately permitted by a bankruptcy court under § 365(e)(2)(A).

Section 362 provides for an automatic but not permanent stay against "any act to obtain possession of property of the estate" from which a party may seek relief "for cause, including the lack of adequate protection of an interest in property." 11 U.S.C. § 362(a)(3), (d)(1); *Cueva*, 371 F.3d at 236; *see also Computer Commc'ns*, 824 F.2d at 729.  The Code itself requires that the stay's effect be automatically triggered upon the filing of a petition for bankruptcy.  *See* § 362(a); *Cueva*, 371 F.3d at 236. Section 541(c)(1) provides that a debtor's estate includes the debtor's interest in property that becomes property of the estate "notwithstanding any provision in an agreement, transfer

hypothetical tests and adopted the actual test on the basis of legislative history and a determination that no assignment existed when prepetition debtors became debtors in possession under the Bankruptcy Code. *Id*. at 612-13.  Instead, Congress's choice to trigger § 365(e)(2)(A)'s exception upon the application of a law to a particular case dictates that an abstract approach should not be read into the statute.

instrument, or applicable nonbankruptcy law" that is conditioned upon the commencement of a bankruptcy case. § 541(c)(1). Recently, Chief Judge Jones explained the principle at issue,

> Sweeping all of the debtor's property into the bankruptcy estate created at filing is the means by which the Code achieves effective and equitable bankruptcy administration. Only through a comprehensive administration of the debtor's property, wherever located and by whomever controlled, can the court shield the property from creditors' unauthorized grasp; prevent harassment of debtors; and ultimately ensure equal distribution among creditors.

*Burgess v. Sikes* (*In re Burgess*), No. 04-31089, ___ F.3d ___, 2006 WL 205043, at *15 (5th Cir. Jan. 27, 2006) (Jones, C.J., dissenting).

Furthermore, this Court has recognized the automatic stay's broad application and noted that such breadth reflects a congressional intent that courts will presume protection of property when faced with uncertainty or ambiguity. *Brown v. Chesnut (In re Chesnut)*, 422 F.3d 298, 303 (5th Cir. 2005). Likewise, the bankruptcy court's discretion to grant a modification or lift of the automatic stay is broad. *Cueva*, 371 F.3d at 236.

Here, Mirant's interest in the Agreement, even if it were ultimately terminable, became property of the estate upon Mirant's filing on July 14, 2003. Accordingly, the Agreement was subject to review by the bankruptcy court, and a party with an interest in an executory contract or lease must come before the bankruptcy court to move for a modification or lift of the stay under § 362(d) in

27

order to effect the terms of an ipso facto clause under § 365(e)(2)(A).

The Bankruptcy Code, which must be read and must function as a whole, demands this conclusion. The Ninth Circuit has noted three compelling reasons to read the Code in this manner. *See Computer Commc'ns*, 824 F.2d at 730 (citing *Wegner Farms Co. v. Merchants Bonding Co. (In re Wegner Farms Co.)*, 49 B.R. 440, 444 (Bankr. N.D. Iowa 1985)). First, § 362(b) provides particular exceptions to the entry of automatic stay, but no exception is provided in the case of executory contracts. *Id.; see also* 11 U.S.C. § 362(b). Second, "elsewhere in the [Bankruptcy Code], Congress expressly overrode the stay provision but did not do so in § 365; and finally . . . not exempting this brand of executory contracts is consistent with the purposes and policies underlying the staying of actions against a debtor postpetition." *Computer Commc'ns*, 824 F.2d at 730-31 (internal quotation marks omitted).

Moreover, on this record, the interplay of the Bankruptcy Code and the Anti-Assignment Act in particular comports with the conclusion that the automatic stay must precede any termination permitted by an ipso facto clause and § 365(e)(2)(A). While the Bankruptcy Code and this Court's caselaw interpreting it require that the initiation of the broad automatic stay is immediate upon filing, such automatic triggering is absent from the text of the Anti-Assignment Act and caselaw interpreting the Act. According to

28

BPA, the termination permitted by § 365(e)(2)(A) and the ipso facto clause of the Agreement here is automatic upon Mirant's filing for relief under the Bankruptcy Code and precedes the entry of automatic stay. We disagree. The Anti-Assignment Act, instead, provides the government with an option to rescind its contracts upon transfer. The Anti-Assignment Act permits the United States to elect its response to the transfer of a contract to which it is a party. The United States may either waive its rights under the Act and continue performance, or it may terminate the contract. *See Tuftco Corp. v. United States*, 614 F.2d 740, 744 (Ct. Cl. 1980) (permitting the United States to waive the Anti-Assignment Act's prohibition of transfer where the government was aware of, assented in writing to, and recognized the assignment); *see also NRG Co. v. United States*, 31 Fed. Cl. 659, 661 (1994). Thus, the Act does not provide for automatic recision of the public contract upon transfer; annulment of the contract at issue requires a response by the United States. The Anti-Assignment Act, and its effect on a given executory contract, may be raised by the government after the entry of a bankruptcy court's automatic stay under, at a minimum, the provision for stay modification. *See* 11 U.S.C. § 362(d).

Accordingly, the automatic stay prohibited BPA from terminating the Agreement. Even when § 365(e)(2)(A) will ultimately permit a nondebtor party to terminate an executory contract by virtue of the combined effect of § 365(e)(2)(A),

29

applicable law, and an ipso facto clause, the nondebtor party must seek relief from the stay before the bankruptcy court under § 362(d).  Therefore, we affirm the bankruptcy court's Stay Violation Order.

**3.  The Denial of Modification to Stay**

We next address BPA's contention that the lower courts erred in failing to lift or modify the stay under § 362(d)(1).  Based upon our conclusion that the Anti-Assignment Act has no application on this record, we cannot say the bankruptcy court abused its discretion in denying BPA's Motion to Modify Stay.  The bankruptcy court denied BPA's motion because the court concluded that BPA failed to show cause for relief from stay under § 362(d)(1), although a portion of the court's conclusion also necessarily rested upon the legal determination that the Anti-Assignment Act is not an applicable law under § 365(c)(1) or (e)(2)(A).

The Bankruptcy Code does not precisely define "cause" under § 362(d)(1), and in the past we have noted that this lack of definition affords "flexibility to the bankruptcy courts." *Little Creek Dev. Co. v. Commonwealth Mortgage Corp.* (*In re Little Creek Dev. Co.*), 779 F.2d 1068, 1072 (5th Cir. 1986) (explaining that lack of good faith is sufficient for "cause" and discussing the inherent balancing required for the court's determination of whether a stay should be lifted under § 362(d)).  Mirant argues that a contractual right to terminate does not constitute

30

sufficient cause to grant relief from the automatic stay. *See Elder-Beerman Stores Corp. v. Thomasville Furniture Indus. Inc. (In re Elder-Beerman Stores Corp.)*, 195 B.R. 1019, 1023 (Bankr. S.D. Ohio 1996). The exception provided by § 365(e)(2)(A) discredits such a broad understanding of the limits on a potential relief from stay, and a bankruptcy court's discretion is not so broad as Mirant argues. Although the district court did not abuse its discretion here to deny the stay's modification, on a record differing in fact, procedure, or both, a bankruptcy court's discretion is limited by the text of § 365(e)(2)(A), that is, in the case in which a law proffered as applicable under § 365(e)(2)(A) is determined to apply to the case, then the stay must be lifted or modified in such a way that permits the entitled nondebtor party to exercise its termination option accordingly.

Here, BPA has not demonstrated cause because the Anti-Assignment Act is not an applicable law on this record because here there has been no transfer. In order for the Act to apply to this case, it must be said that the Agreement was "transferred" within the meaning of the Act. *See* 41 U.S.C. § 15. The caselaw, however, does not support BPA's reading of transfer under the Act. On this record, the Anti-Assignment Act cannot apply because no assignment, which would be prohibited by the Act, occurred between prepetition debtor and debtor in possession for three salient reasons. First, Mirant never affirmatively assumed or rejected the Agreement. *See*

31

11 U.S.C. § 365(a).[19]  According to § 365(f)(2)(A), assumption must precede assignment.  *See* § 365(f)(2)(A); *see also Cinicola v. Scharffenberger*, 248 F.3d 110, 120 (3d Cir. 2001).  Here, Mirant did not assume the Agreement.  Second, BPA might have moved under § 365(d)(2)[20] for the court to order Mirant to determine, within time constraints, whether it would assume or reject the Agreement.  But BPA never so moved the court, nor did it make any effort apparent on the record (other than the letter, sent to Mirant, unilaterally terminating the Agreement) to either the bankruptcy court or with opposing counsel to resolve the question of assumption or rejection.  Finally, BPA conceded to the bankruptcy court that there was no assignee in fact.  On such a record, no transfer – prohibited by the Anti-Assignment Act – has occurred or even been attempted, and therefore the Act is not an applicable law.

---

[19]We have previously recognized that in Chapter 11 proceedings, an executory contract might be neither assumed, rejected, nor assigned and that in such a circumstance, the contract would ride through the proceedings, leaving the nondebtor's claim to survive the bankruptcy. *Century Indem. Co. v. NGC Settlement Trust* (*In re Nat'l Gypsum Co.*), 208 F.3d 498, 504 n.4 (5th Cir. 2000).

[20]Section 365(d)(2) vested BPA with the procedure to demand Mirant's action with respect to the Agreement.  "[T]he court, on the request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease." § 365(d)(2). This statutory provision, as the bankruptcy court noted, offered BPA the means to obtain the information it needed, whether Mirant would assume or reject the Agreement after filing for bankruptcy, and in the time in which BPA urged that an answer was needed.

The parties dispute whether, as a matter of law, a transfer or assignment occurs as a result of the change in status from prepetition debtor to debtor in possession. If the change in the status produces a transfer of the executory contract, then according to BPA, the Anti-Assignment Act applies. If the change in status is nominal only and there is no transfer or assignment as a matter of law, then, as Mirant argues, the Anti-Assignment Act may have no applicability in the absence of a transfer. *See* 41 U.S.C. § 15 (providing that "any such transfer shall cause the annulment of the contract or order transferred, so far as the United States is concerned"). We need not, on this record, resolve this res nova question.[21] We hold only what this record permits, that is, no transfer occurs under the Anti-Assignment Act where the

---

[21]Though other courts have concluded no assignment exists with respect to an executory contract or lease as a result of the change in status between a prepetition debtor and a debtor in possession, *see Summit Inv.*, 69 F.3d at 613-14 (discussing *Bildisco*, 465 U.S. at 528); *United States v. Gerth*, 991 F.2d 1428 (8th Cir. 1993), we cannot agree that the Supreme Court has conclusively resolved this question. Instead, in *Bildisco*, the Court merely stated, "[f]or our purposes, it is sensible to view the debtor-in-possession as the same 'entity' which existed before the filing of the bankruptcy petition, but empowered by virtue of the Bankruptcy Code to deal with its contracts and property in a manner it could not have done absent the bankruptcy filing." 465 U.S. at 528. That "sensible view," necessary only for the purposes of that case, does not support in all cases the proposition that no assignment or transfer occurs as a matter of law between prepetition debtor and debtor in possession. Accordingly, neither the Supreme Court nor this Circuit has resolved the argument presented by BPA that rights obtained in bankruptcy require that a debtor in possession be treated as a distinct legal entity from a prepetition debtor.

33

debtor neither assumes nor attempts to assume the executory contract, the nondebtor concedes there is no assignment in fact, and the nondebtor, seeking to invoke the combined effect of the Anti-Assignment Act and § 365(e)(2)(A), fails to move for assumption or rejection under § 365(d)(2). In such a circumstance, where no party has moved to assume the executory contract before the bankruptcy court, no assignment occurs between prepetition debtor and debtor in possession with respect to the Anti-Assignment Act and § 365(e)(2)(A).

## III. Conclusion

For the foregoing reasons, the bankruptcy court correctly determined that a Chapter 11 automatic stay must precede the enforcement of any eventual right a nondebtor may have to terminate an executory contract under § 365(e)(2)(A). Accordingly, we affirm the bankruptcy court's Stay Violation Order. Also, the bankruptcy court did not abuse its discretion to deny modification or lift of stay where no assignment or transfer had occurred or been attempted. On such a record, the Anti-Assignment Act is not an applicable law under § 365(e)(2)(A).

**AFFIRMED.**